BELLE STATE BANK, a corporation, Plaintiff-Appellant,

v.

INDUSTRIAL COMMISSION of Missouri, DIVISION OF EMPLOYMENT SECURITY, and Wanda J. Tackett, Defendants-Respondents.

BELLE STATE BANK, a corporation, Plaintiff-Appellant,

v.

INDUSTRIAL COMMISSION of Missouri, DIVISION OF EMPLOYMENT SECURITY, and Joanne Barbarick, Defendants-Respondents.

Nos. 9762, 9763.

Missouri Court of Appeals, Springfield District.

Jan. 31, 1977.

Motion for Rehearing or to Transfer Denied Feb. 17, 1977.

Application to Transfer Denied April 11, 1977.

Thomas A. Vetter, Jefferson City, for plaintiff-appellant.

Charles B. Fain, Jefferson City, for respondent Industrial Commission of Missouri.

Terry C. Allen, Jefferson City, for respondent Division of Employment Security.

Before STONE, P. J., and HOGAN and FLANIGAN, JJ.

STONE, Presiding Judge.

These appeals in the above-captioned consolidated cases involve and challenge the allowance to claimants, Mrs. Joanne Barbarick and Mrs. Wanda J. Tackett, of unemployment benefits under the Missouri Employment Security Law (the Law). Chapter 288.[1] Both claimants were employed by the Belle State Bank (a "country bank"[2]), Mrs. Barbarick as an assistant cashier and Mrs. Tackett as a bookkeeper, when the ownership of the bank changed hands on July 26, 1973. On August 16, 1973, shortly after a meeting of the new Board of Directors, vice-president Hunter informed claimants and other bank employees of certain changes, which the new management proposed to put into effect on a trial basis on September 1, 1973. In the meantime, Mrs. Barbarick voluntarily quit her job on the morning of August 17 and Mrs. Tackett followed suit on August 23.

On August 27, each filed a claim for benefits under the Law; and on September 13, a deputy of the Division of Employment Security (the Division) handed down a "determination" in each case finding that claimant was disqualified for the reason that (as summarized in each determination) the proposed changes were "not unreasonable and did not give the claimant good cause to quit." On claimants' separate appeals from the deputy's determinations, an appeals referee of the Division (the referee) conducted an informal consolidated hearing at which, with none of the parties represented by counsel, both claimants and Dean

---

1. Except as otherwise specifically stated, all statutory references herein are to RSMo 1969, V.A.M.S.

2. From the official state highway map, we know judicially that the town of Belle is in the northeast corner of Maries County just south of the east-west boundary line between that county and Osage County on the north, and that this location is some twenty-five miles north of Rolla and nineteen miles south of Linn [*In re Village of Lone Jack*, 419 S.W.2d 87, 91(6) (Mo. banc 1967); *Walsh v. Table Rock Asphalt Construction Co.*, 522 S.W.2d 116, 118(1) (Mo.App. 1975); *Galemore v. Haley*, 471 S.W.2d 518, 520 (Mo.App. 1971)]; and, as a matter of general public knowledge among Ozarkians of which we need not and do not profess ignorance [*Elder v. Delcour*, 364 Mo. 835, 838, 269 S.W.2d 17, 19(2), 47 A.L.R.2d 370 (banc 1954)], we observe that the topography of that area "is stamped [with] the grandeur of the magnificent Ozark uplift." *Hobart-Lee Tie Co. v. Grabner*, 206 Mo.App. 96, 104, 219 S.W. 975, 977(4) (1920), quoted in *Elder v. Delcour*, supra, 364 Mo. at 846, 269 S.W.2d at 25. The United States decennial census reports, from which the courts frequently glean information [e.g., *Varble v. Whitecotton*, 354 Mo. 570, 575, 190 S.W.2d 244, 246(4); *Moulder v. Webb*, 527 S.W.2d 417, 419(4) (Mo.App. 1975); *City of Ash Grove v. Davis*, 418 S.W.2d 194, 197(7) (Mo.App. 1967)], reveal that in 1960 Belle was a community of some 1,016 souls, all of whom resided in Maries County, and in 1970 embraced 1,133 persons, 91 of whom resided in Osage County north of the aforementioned east-west county boundary line.

Hunter, the executive vice-president of employer Belle State Bank, testified at length and without limitation or restriction by evidentiary rules or otherwise. For that matter, the transcript is liberally laced not only with the garden varieties of testimonial statements commonly received in administrative hearings of this character but also with self-serving statements, conclusions and comments, some of which were in response to the referee's express invitation. In due time, the referee made written findings, concluded that claimants were not disqualified for benefits, and reversed the deputy's determinations to the contrary. These findings and decision of the appeals referee, subsequently adopted by the members of the Industrial Commission (the Commission) in orders denying the Bank's applications for review, became the findings and decision of the Commission for the purpose of judicial review. § 288.200(1); *Von Hoffman Press, Inc. v. Industrial Commission,* 478 S.W.2d 403, 404 (Mo.App. 1972); *Associated Grocers' Co. of St. Louis, Mo. v. Crowe,* 389 S.W.2d 395, 397(1) (Mo.App. 1965).

■ Before proceeding to the testimonial evidence presented to the referee, we note certain relevant and significant statutory provisions bearing upon claimants' right to unemployment benefits, and then remind ourselves of the scope of our appellate review. When the present Law was enacted in 1951, the legislature declared that "the public good and the general welfare" required such enactment "for compulsory setting aside of unemployment reserves to be used for the benefit of persons *unemployed through no fault of their own*" [Laws of Mo. 1951, pp. 565–566]—a declaration which has been carried forward unchanged to this date. § 288.020(1). (All emphasis herein is ours) And, since 1957 the Law has contained a provision expressly disqualifying a claimant for benefits if "he has left his work *voluntarily without good cause* attributable to his work or to his employer . . . ." Laws of Mo. 1957, p. 541; now § 288.050, subd. 1(1). Thus, instant claim-

ants qualified for benefits under the Law only if they quit their employment for good cause, and the burden of establishing such qualification for benefits rested on them. *Producers Produce Co. v. Industrial Commission,* 365 Mo. 996, 1007, 291 S.W.2d 166, 173(2) (banc 1956); *O'Dell v. Division of Employment Security,* 376 S.W.2d 137, 142(7) (Mo. 1964).

■ As to *questions of fact,* our appellate examination is limited to ascertaining upon the whole record whether the Commission reasonably could have made its findings and decision, viewing the evidence in the light most favorable to the award. However, as to *questions of law,* we are not bound by decisions of the Commission [*Citizens Bank of Shelbyville v. Industrial Commission,* 428 S.W.2d 895, 897(4) (Mo.App. 1968); *Combustion Engineering, Inc. v. O'Connor,* 395 S.W.2d 528, 529(1, 2) (Mo.App. 1965)]; and, "[w]hether the favorable evidence establishes good cause is a *question of law.*" *Citizens Bank of Shelbyville v. Industrial Commission,* supra, 428 S.W.2d at 897(3). See *Poggemoeller v. Industrial Commission,* 371 S.W.2d 488, 498(5) (Mo.App. 1963). In reviewing the record, we remain mindful that § 288.020(2) requires a liberal, yet fair and reasonable, construction of the Law, and that the disqualifying provisions of § 288.-050 must be strictly construed. *O'Dell v. Division of Employment Security,* supra, 376 S.W.2d at 141–142(3–5); *Kroger Company v. Industrial Commission,* 314 S.W.2d 250, 254(3) (Mo.App. 1958).

Turning to the facts, we find that the changes proposed by the new bank management, which claimants cited as motivating and justifying their voluntary termination of employment, pertained to the periodic wage payment dates, sick leave benefits, and scheduling of bank employees' working hours each week. (a) *Wage payment dates.* Employees were being paid every two weeks. The proposed change was to pay them the first and fifteenth of each month. (b) *Sick leave benefits.* The former management had granted sick leave of seven days each year with any unused sick leave

carried over and accumulated. The new management proposed to grant annual sick leave of five and one-half days, any unused portion of which could not be carried over and accumulated. (c) *Scheduling of working hours each week.* The bank was open for business five and one-half days each week, with banking hours from 9 A.M. to 3 P.M. on Monday through Friday and 9 A.M. to noon on Saturday. Claimants testified that they "started" at 8 A.M. and "worked until done," whenever that might have been. However, there was no showing or suggestion that any record reflecting the number of hours worked by each employee during any day or week had been kept. Under the former management, each claimant did not work one day during the week. The plan outlined by new management contemplated elimination of this one day off work each week. Vice-president Hunter insisted that would not necessarily have increased the number of hours either claimant would have worked during the week—a statement for which no explanation or elaboration was volunteered or sought.

Claimants also complained that they would have lost nine days' *holiday pay* each year by reason of the proposed elimination of one day off work each week. However, Hunter stated positively that the proposed plan recognized and granted the same holidays with pay, and such explanation as claimants undertook concerning their apprehension that holiday pay would have been eliminated was so diffuse, vague, amphibological, uninterpretable and meaningless that it afforded no evidentiary basis for administrative or judicial validation of that apprehension.

It is important to note and bear in mind that none of the foregoing proposed changes were presented to claimants as being firm and final. On the contrary, Hunter pointed out to claimants (*as they conceded*) that the new owners had purchased the bank only recently and were "in sort of a state of limbo," that the proposed changes

were not hard-and-fast rulings and "adjustments" would be made, and that "we would have to wait and see what the final outcome would be." And, the referee recognized and confirmed in his written "Findings" that "[t]he employer's president [Reed] told the claimants that the changes were only temporary [and] . . . that further adjustments were being considered and he asked them to wait and see the final result of the changes."

The evidence presented to the referee showed that indeed shortly thereafter (and apparently before the proposed changes were to be placed in effect on a trial basis) "adjustments" were made, one of them being a return to the prior practice of scheduling working hours so that each employee had "a day off [each week] as previously," thus eliminating any basis for complaint in one of the three areas outlined supra, namely, *scheduling of working hours each week,* and thereby also disposing of the related and dependent nebulous complaint about possible loss of *holiday pay.*

It is self-evident that, in and of itself, simply changing *wage payment dates* from every two weeks to the first and fifteenth days of each month, could not have adversely affected any employee; and, there was no evidence or showing that it did. This area of complaint was patently sans substance or validity.

In the sole remaining area of complaint, to wit, *sick leave benefits,* the proposed change *from* (a) sick leave of seven days each year with any unused portion thereof carried over and accumulated *to* (b) sick leave of five and one-half days each year which, if not used, could not be carried over, was implemented and in effect at the time of hearing. We note parenthetically Hunter's voluntary explanation that the new owners made this change because they thought the former allowance "was excessive . . . the way the pay scale was." [3] That explanation aside, it appears that the reduction in sick leave benefits was

---

**3.** Claimant Barbarick was an assistant cashier then being paid $140 per week (approximately $606.67 per month), and claimant Tackett was a bookkeeper then being paid $95 per week

the only implemented change which could have had *any* economic effect (and that quite limited and relatively minor) upon claimants or other bank employees.

■ The determinative issue here is whether or not the above-outlined state of facts afforded *"good cause,"* within the contemplation and intent of the Law, for claimants to voluntarily quit their jobs. In considering and resolving this issue, we bear in mind not only that the words "good cause" are not susceptible of precise definition and have no fixed meaning,[4] but also that those words should be accorded "their plain and rational meaning in the light of the purpose of the Employment Security Law" [*Citizens Bank of Shelbyville v. Industrial Commission,* supra, 428 S.W.2d at 899(7)], i.e., to set aside funds "to be used for the benefit of persons unemployed *through no fault of their own."* § 288.-020(1).

■ Obviously, "good cause," as used in the Law, should and does contemplate and require a cause reasonably sufficient to justify an employee in voluntarily leaving the ranks of the employed and joining the ranks of the unemployed [*Associated Utility Services, Inc. v. Board of Review,* 131 N.J. Super. 584, 331 A.2d 39, 40 (1974); *Zielenski*

*v. Board of Review,* 85 N.J.Super. 46, 203 A.2d 635, 638(4) (1964); *O'Neal's Bus Service, Inc. v. Employment Security Com'n.,* Del.Super., 269 A.2d 247, 249(3) (1970)], or, otherwise stated, a cause which reasonably would motivate the average able-bodied and qualified worker in a similar situation to terminate his or her employment with its certain wage rewards in order to enter the ranks of the compensated unemployed. *Sun Shipbuilding & Dry Dock Co. v. Unemployment Comp. Board of Review,* 358 Pa. 224, 56 A.2d 254, 261(10) (1948); *Uniweld Products, Inc. v. Industrial Relations Commission,* 277 So.2d 827, 829(1) (Fla.App. 1973). And "good cause" has been appropriately characterized as requiring not only the merely negative virtue of freedom from fraud but also positive conduct which is consistent with a genuine desire to work and be self-supporting. *Lattanzio v. Unemployment Comp. Board of Review,* 461 Pa. 392, 336 A.2d 595, 598 (1975); *Welker v. Unemployment Comp. Board of Review,* 180 Pa.Super. 534, 119 A.2d 658, 659(3) (1956).

■ To constitute good cause, the circumstances motivating an employee to voluntarily terminate employment must be real not imaginary, substantial not trifling, and reasonable not whimsical,[5] and *good faith* is an essential element.[6] The stan-

(approximately $411.67 per month). When claimants voluntarily quit, each insisted that she be paid at her regular wage rate for all unused sick leave accumulated to that date; and, although neither convinced nor agreeing that employees were entitled to translate or convert unused sick leave into cash, the new management acceded to claimants' demands and paid the gross sum of $728 (after withholding tax, $594.88) to claimant Barbarick for 26 days of accumulated sick leave and the gross sum of $228 (after withholding tax, $180.04) to claimant Tackett for 12 days of accumulated sick leave.

4. *Citizens State Bank of Shelbyville v. Industrial Commission,* 428 S.W.2d 895, 897(2) (Mo. App. 1968); *Buttinger v. Ely & Walker Dry Goods Co.,* 42 S.W.2d 982, 984(3) (Mo.App. 1931). See *Wilson v. Morris,* 369 S.W.2d 402, 407(7) (Mo. 1963); *Lambert Brothers, Inc. v. Tri City Construction Co.,* 514 S.W.2d 838, 842 (Mo.App. 1974).

5. *Roby v. Potlatch Forests,* 74 Idaho 404, 263 P.2d 553, 555(2) (1953); *Barclay White Co. v. Unemployment Comp. Board of Review,* 356 Pa. 43, 50 A.2d 336, 340 (1947); *Sledziowski v. Unemployment Comp. Board of Review,* 195 Pa.Super. 337, 171 A.2d 546, 547 (1961); *Kessler v. Industrial Commission,* 27 Wis.2d 398, 134 N.W.2d 412, 414(4) (1965). For a factually unique case in which "good cause" was not found and benefits were denied to a female employee who voluntarily quit work on account of the alleged "sexist" attitude of her employer and fellow employees, see *McCain v. Employment Division,* 17 Or.App. 442, 522 P.2d 1208 (1974).

6. *Department of Industrial Relations v. Estes,* 45 Ala.App. 360, 231 So.2d 137, 140 (1970); *Dwight Mfg. Co. v. Long,* 36 Ala.App. 387, 56 So.2d 685, 686(2) (1952); *Roby,* supra note 5, 263 P.2d at 556(3); *Lattanzio v. Unemployment*

dard as to what constitutes good cause is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive. *Conrad v. Altmiller,* 89 Idaho 214, 404 P.2d 337, 338 (1965); *Uniweld Products, Inc. v. Industrial Relations Comn.,* supra, 277 So.2d at 829(2).

It is plain and indisputable that the legislative purpose of the Missouri Employment Security Law was when enacted [Laws of 1951, pp. 565–566], and still is [§ 288.020(1)], to provide monetary relief for persons *"unemployed through no fault of their own "* and thereby to alleviate the distressing consequences of *involuntary* unemployment; and that, on the other hand, the Law was *not* designed or intended to benefit those who voluntarily choose to become idle. If every "reason" which appeals to an employee's head or heart were to be accepted as "good cause" for his or her voluntary termination of employment, the title of the Employment Security Law would become a hollow and misleading mockery and the Law itself would afford open opportunity, if not implied invitation, for abundant abuse and periodic perversion.

As hereinbefore noted, at the same time claimants were initially informed on August 16 of the changes which the new management proposed to put into effect on a trial basis some two weeks later, to wit, on September 1, claimants also were told (as the referee summarized it) "that the changes were only temporary [and] . . that further adjustments were being considered and he [vice-president Hunter] asked them to wait and see the final result

of the changes." Rejecting this request, claimant Barbarick voluntarily quit the next morning and claimant Tackett likewise quit on August 23.

■ Applying the standard of reasonableness as reckoned by what an average employee would have done under the same or similar circumstances, and bearing in mind that there was no showing or suggestion that termination of employment by either claimant was predicated upon urgency or necessity, we are of the opinion that claimants' petulant and hasty action in voluntarily quitting before *any changes* had been placed·in effect and without awaiting the "further adjustments" under consideration by the new management and thus without knowledge of "the final result" of such changes as might be subsequently implemented may not be accepted and approved as reasonable conduct motivated by "good cause." [7] Nor may claimants' abrupt and impetuous abandonment of their employment be rationalized and regarded as reasonable conduct motivated by "good cause" on account of the subsequently implemented changes, to wit, (a) the innocuous change in wage payment dates and (b) the change in sick leave benefits which in any event could have had no more than limited and relatively minor economic effect upon claimants.[8] In fine, there is nothing in the record before us which should or may be recognized by the law as "good cause" for claimants' voluntary termination of employment.[9]

■ Although the foregoing is dispositive of the present appeal, another aspect of the

*Comp. Board of Review,* 461 Pa. 392, 336 A.2d 595, 598 (1975); *Bentz v. Unemployment Comp. Board of Review,* 190 Pa.Super. 582, 155 A.2d 461, 463(7) (1959).

**7.** See *Andala Co. v. Ganus,* 269 Ala. 571, 115 So.2d 123, 125(3) (1959); *Goldstein v. Unemployment Comp. Board of Review,* 181 Pa.Super. 255, 124 A.2d 401 (1956); *Kaylock v. Unemployment Comp. Board of Review,* 165 Pa. Super. 376, 67 A.2d 801 (1949).

**8.** See the following unemployment compensation cases in which reductions in wages or discontinuance of bonuses was held not to afford "good cause" for employees' voluntary

termination of employment: *Hessler v. American Television & Radio Co.,* 258 Minn. 541, 104 N.W.2d 876, 882, 883–884(6), 886–887(9, 10) (1960); *Longobardi v. Unemployment Insurance Appeal Board,* Del.Super., 287 A.2d 690, 692(6) (1971); *Kessler v. Industrial Commission,* 27 Wis.2d 398, 134 N.W.2d 412, 415(6) (1965); *In re Anderson,* 39 Wash.2d 356, 235 P.2d 303, 306, 309(6) (1951).

**9.** See *Citizens Bank of Shelbyville v. Industrial Commission,* supra note 4, 428 S.W.2d at 899–901, and *Burroughs v. Employment Security*

claims in suit and the hearing thereupon conducted by the referee, albeit ˚not presented by the parties, obtrudes on the face of the record and merits sua sponte comment here, which should be welcomed (so we believe) by those intrusted and charged with judicious and prudent administration of the Law and disbursement of funds only to qualified claimants. Since enactment of the first Missouri legislation in this field, then more appropriately (we think) and certainly more forthrightly entitled as the *"Unemployment Compensation Law"* [Laws of 1937, p. 574], one of the statutory conditions of eligibility to receive benefits has been that "he [or she] is able to work, and is *available for work"* [Laws of 1937, p. 590]; and, since 1943 that quoted condition has been statutorily defined and delimited by the explicit proviso *"that no person shall be deemed available for work unless he has been and is actively and earnestly seeking work."* Laws of 1943, p. 933; now § 288.040, subd. 1(2). Thus, as cast in the distinctive style of our departed companion, Ruark, P. J., "[t]he whole kernel in the nut is that [a] claimant is *not* entitled to draw pay because she lost [or quit] her job" but rather "[t]he compensation is payable *because she can't get another one.* She must really and sincerely look for the job, not wait for the job to seek her out. Nor will a lackadaisical, half-hearted, or occasional effort suffice." *Fly v. Industrial Commission,* 359 S.W.2d 481, 483–484(3) (Mo.App. 1962).

Again, in discussing the meaning and purpose of the above-quoted explicit proviso, we said in *Rapp v. Industrial Commission of Missouri,* 360 S.W.2d 366, 370(6) (Mo.App. 1962), that "[i]n putting upon the added language, 'honestly and faithfully, its

plain and rational meaning' [*Cummins v. Kansas City Public Service Co.,* 334 Mo. 672, 684, 66 S.W.2d 920, 925; *Artophone Corp. v. Coale,* 345 Mo. 344, 353, 133 S.W.2d 343, 347] and in taking the words of the amended statute 'in their plain or ordinary and usual sense' [Section 1.090], we consult the same authority, to which our brethren of the high court have turned; and, so doing, we conclude that, to be deemed 'available for work' under the statute [Section 288.-040, subd. 1(2)], which now includes the specific requirement that the unemployed person 'has been and is  .  .  .  *earnestly* seeking work,' a claimant must adduce competent and substantial evidence from which the Commission reasonably may find, and is persuaded to find, that such claimant's search for work is 'zealous, ardent, sincere, hearty,' since 'earnest' is synonymous with those terms and 'always connotes sincerity.' Webster's New International Dictionary, Second Edition, p. 808." To the same effect, see Webster's Third New International Dictionary, p. 714; The American Heritage Dictionary Of The English Language, p. 409; The Shorter Oxford English Dictionary, Third Edition, p. 578.

In *Fly* and *Rapp,* supra, the transcripts on appeal affirmatively disclosed and identified the employers to whom, and the dates on which, each of those claimants had applied for employment. With none of the parties in the instant cases then represented by counsel, such testimony as pertained to instant claimants' alleged applications for employment elsewhere was elicited by the referee and is here quoted marginally in its entirety.[10] On the face of it, the referee's shallow, superficial and cursory interrogation of claimants apparently intended to satisfy the above-quoted statutory condition

---

Agency, 86 Idaho 412, 387 P.2d 473 (1963), each denying the claim of a female bank employee who had worked, as had instant claimants, under supervision of the cashier.

**10.** *Claimant Barbarick's testimony:*
  "Q. Did you want to work?
  "A. Yes. I applied for work. While I have been off I have applied for work.
  "Q. And did you refuse any work?
  "A. No, sir, I have not.

"Q. What hours do you want to work?
"A. Eight hours a day, starting at seven or eight in the morning.
"Q. Five days a week?
"A. Yes, sir.
"Q. What wage are you willing to accept?
"A. Well, nothing lower than I was receiving."
*Claimant Tackett's testimony:*
"Q. Did you want to work during this period (8/26/73 to 9/22/73)?

of eligibility for benefits, i.e., that each of them was "actively and earnestly seeking work," was patently inadequate and insufficient to admit of an informed conclusion as to whether or not either claimant had satisfied that statutory condition of eligibility.

Furthermore, it appears that, when the referee inquired what wage claimant Barbarick was "willing to accept" and she declared unequivocally "[w]ell, nothing lower than I was receiving [approximately $606.67 per month]," she prima facie disqualified herself for benefits under the Law. For, it has been held that "*a claimant cannot unduly restrict her availability for employment by arbitrarily limiting the character of work, the area within which employment is sought or would be taken, or the wage which would be acceptable.*" *Blackman v. Industrial Commission*, 491 S.W.2d 18, 24(8) (Mo.App. 1973). See also *Rapp*, supra, 360 S.W.2d at 371. Additionally, cognizant only of the geographical location and population of Belle (and that by taking judicial notice thereof), and with no other evidence bearing upon this important and relevant subject, neither the referee nor any reviewing agency or court could have known what other positions, *if any*, *then* paying no less than $606.67 per month, there might have been in Belle or that vicinity for an employee with the qualifications of claimant Barbarick.

In view of the provisions of § 288.-070, subds. 5 and 6 [Laws of 1972, p. 919], in effect at the time of the initial redetermination by the appeals referee declaring that claimants were not disqualified for benefits, claimants no doubt already have received all of the benefits payable under the Law, none of which can be recovered from them. However, none of those benefits are chargeable, and none shall be charged, to or against the employer, Belle State Bank. § 288.070, subd. 7 [Laws of 1972, p. 919;

now Laws of 1974, p. 867]. See *Dubinsky Brothers, Inc. v. Industrial Commission*, 373 S.W.2d 9, 16(6) (Mo. banc 1963). Accordingly, it is the judgment of this court that (a) the findings and decision of the Industrial Commission adopting the findings and decision of the appeals referee should be, and hereby are, set aside and for naught held, (b) the judgment of the Circuit Court of Maries County approving and adopting those findings and decision as its "decision" should be, and hereby are, set aside and for naught held, and (c) this cause should be, and hereby is, remanded to the Missouri Department of Labor and Industrial Relations, now invested with all of the powers, duties and functions of the Industrial Commission under and by virtue of Section 8 of the Reorganization Act of 1974 [Laws of Missouri 1974, p. 542] with directions to take such action as may be necessary to implement fully the foregoing opinion and the judgment of this court.

HOGAN and FLANIGAN, JJ., concur.

"A. Yes.
"Q. Were you sick in any of these weeks?
"A. No.
"Q. Did you refuse any work?
"A. No, I haven't.
"Q. Did you do any work during these weeks?

"A. No.
"Q. Did you go to employers and apply for work?
"A. Yes, sir."