**ST. LOUIS HOUSING AUTHORITY,**
Plaintiff-Appellant,

v.

**LABOR AND INDUSTRIAL RELATIONS COMMISSION, DIVISION OF EMPLOYMENT SECURITY and Patricia A. Johnson, Defendants-Respondents.**

No. 44970.

Missouri Court of Appeals,
Eastern District,
Division Three.

Sept. 7, 1982.

Edward C. Cody, Charles W. Kunderer, St. Louis, for plaintiff-appellant.

Catherine J. Barrie, Jefferson City, for defendants-respondents.

SNYDER, Judge.

This is an appeal from a circuit court judgment which affirmed a grant of unemployment benefits by the Labor & Industrial Relations Commission of the Division of Employment Security (Commission) to claimant Patricia A. Johnson. The circuit court affirmed the Commission's grant of

benefits based on their ruling that claimant had voluntarily left her work for good cause attributable to her work or her employer. The judgment is reversed.

The primary issue here is whether the claimant successfully established that she left her work for good cause attributable to her work on her employer.

Patricia A. Johnson was hired in July, 1976, by the St. Louis Housing authority as one of six "lane managers" at the Clinton-Peabody housing projects. All the lane managers worked from their homes and responded to calls over a paging system. Their duties included handling tenant complaints, passing out mail and fliers, and checking on empty apartments. Normally, the work day ran from 8:15 a.m. to 5:00 p.m.

Prior to 1979, the claimant received $3.00 an hour. The appellant housing authority paid $2.38 of that hourly wage. The remainder was supplied, in a separate check, by a tenant-management corporation that ran the housing project. This supplement was not required by the appellant. In January, 1979, the management corporation determined that it could no longer afford to supplement the lane manager's pay. As a result, the claimant's salary dropped to $2.38 an hour, almost a 20 percent decrease. There is some dispute as to whether all of the lane managers were affected, but it was established that at least three lane managers no longer received the supplement.

The claimant continued to work as a lane manager until December 28, 1979. At that time, her pay had increased to $2.90 an hour, only three percent less than her salary before the January, 1979 cut. On January 1, 1980, three days after the claimant quit, her wages would have increased to $3.10 an hour.

Although six lane managers were normally employed by the Housing Authority to run the housing project, there were several periods in 1979 when up to three of these positions were vacant. During these periods, the remaining lane managers were required to assume extra duties.

However, at the time the appellant quit, the project had five lane managers. The sixth position had been open since August, 1979 because the firing of the sixth lane manager was being appealed. As a result of the unfilled position, the appellant was required to put in 10 to 15 minutes overtime per day.

The apartments normally managed by claimant were near her own apartment. The additional units for which she was temporarily responsible were five blocks away. Claimant testified that she had to visit the other apartments at least three times a day. Her supervisor claimed she was only required to visit the other apartments once a day. The claimant complained to her supervisor about the extra work, but was told the sixth manager position could not be filled until·the appeals process had been completed.

In her written resignation, the claimant stated that·she was quitting "partially due to the added workload." At a hearing before the Appeals Referee for the Labor & Industrial Relations Commission, Division of Employment Security, the claimant also discussed "personal reasons" for quitting: Her husband felt she was being unfairly treated and pressured her to quit.

Initially, the claimant was denied unemployment benefits because she had voluntarily terminated employment without good cause. An appeals referee for the Commission reversed that decision, ruling that "additional work for less pay constituted good cause attributable to her employer for the employee to leave her work." That ruling was affirmed by the full Commission and the circuit court of the City of St. Louis.

The appellant claims that the reduction in pay and the increased work load were not sufficient "good cause" to terminate employment and receive unemployment benefits. This court agrees.

▮▮ Under § 288.050.1(1) RSMo. 1978, a person will be denied unemployment benefits if he "... *has left his work voluntarily without good cause attributable to his work or employer.*" *Contractor's Supply Co. v.*

*Labor & Industrial Relations Commission,* 614 S.W.2d 563, 564 (Mo.App.1981). Whether the favorable evidence establishes good cause is a question of law and this court is not bound by the decisions of the Commission. In addition, the disqualifying provisions of § 288.050 must be strictly construed. *Belle State Bank v. Industrial Commission, Division of Employment Security,* 547 S.W.2d 841, 844 (Mo.App.1977).

"[G]ood cause for voluntary unemployment is limited to instances where the unemployment is caused by external pressures so compelling that a reasonably prudent person would be justified in giving up employment." *Citizens Bank of Shelbyville v. Industrial Commission,* 428 S.W.2d 895, 899[10] (Mo.App.1968). "[T]he circumstances motivating an employee to voluntarily terminate employment must be *real,* not imaginary, *substantial* not trifling, and *reasonable,* not whimsical, and good faith is an essential element. The standard as to what constitutes good cause is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive." *Belle State Bank v. Industrial Commission, Division of Employment Security, supra* at 846–47[5] (Emphasis added).

The decision to be made on appeal, then, is whether the claimant's decision to voluntarily terminate employment was reasonable and made in good faith. *Contractor's Supply Co. v. Labor & Industrial Relations Commission* at 564–565.

In Missouri, a reduction in pay has been deemed good cause to terminate, but in conjunction with other aggravating circumstances: demotion, loss of fringe benefits and a feeling of being forced out.

*Armco Steel Corp. v. Labor & Industrial Relations Commission,* 553 S.W.2d 506 (Mo. App.1977). Armco is distinguishable on the facts. Here, the claimant's reduction in pay was not as substantial as in Armco and not immediately accompanied by any other aggravating factors.

Claimant was not the only lane manager to receive a reduction in pay. At least three in that project did. The cessation of the stipend merely placed the claimant in the same authorized and established public salary classification as all other lane managers at St. Louis Housing Authority housing projects.[1]

In addition, by the time the claimant actually quit her job, her pay was within three percent of previous wages and would soon have exceeded it. She had worked for almost a year after her pay was reduced. At the time when she actually terminated, the reduction in pay could not be said to be a real, substantial or reasonable motivating factor in her decision.[2] See *Belle State Bank v. Industrial Commission, Division of Employment Security, supra.*

The increased workload amounted to 10 to 15 minutes a day. The workload was shared by all the lane managers. Such a small increase alone cannot be held to be determinative. This is not a situation where respondent's workload was substantially increased or even doubled, as in *Mosebauer v. Commonwealth Unemployment Compensation Board of Review,* 433 A.2d 599 (Pa.Comm.Ct.1981) or *Zepp v. Arthur Treacher Fish 'n Chips, Inc.,* 272 N.W.2d 262 (Minn.1978). In addition, the respondent's supervisor made it clear that the situation was temporary and an additional manager would be hired upon resolution of the ad-

1. Because the reduction in pay was not substantial at the time claimant quit her job, there is no need to discuss whether the discontinuance of a stipend provided by a third party constitutes a reduction in pay. The pay scale for lane managers is set by the St. Louis Housing Authority's board of commissioners and the U.S. Department of Housing and Urban Development.

2. It should be remembered that good faith is also an element in voluntary termination for good cause. *Contractor's Supply Co. v. Labor*

*& Industrial Relations Commission, supra.* Quitting a job is a drastic remedy. Employees are expected to consult their employers before quitting in an effort to resolve the problems causing the desire to quit. See *Division of Employment Security v. Labor & Industrial Relations Commission,* 636 S.W.2d 361 (1982). It stands to reason, then, that if the problem is resolved or in the process of being solved, the employee no longer has "good cause" under § 288.050 RSMo. 1978.

ministrative appeal pending at the time. The fact only three lane managers were employed at one point is irrelevant. Five managers had been employed from late August until claimant quit on December 28, 1978. The circumstances that existed at the point of termination are the factors which constitute or do not constitute good cause.

■ "Good cause", as used in § 288.050.-1(1) RSMo. 1978 contemplates and requires a cause "reasonably sufficient to justify an employee in voluntarily leaving the ranks of the employed and joining the ranks of the unemployed." *Belle State Bank v. Industrial Commission, Division of Employment Security, supra* at 846. Claimant was not subjected to "external pressures so compelling that a reasonably prudent would be justified in giving up employment." *Citizens Bank of Shelbyville v. Industrial Commission, supra* at 901. Pressure from a spouse to quit a job does not constitute good cause under § 288.050.1(1).

■ "If every 'reason' which appeals to an employees' head or heart were to be accepted as 'good cause' for his or her voluntary termination of employment, the title of the Employment Security Law would ... afford open opportunity, if not implied invitation, for abundant abuse and periodic perversion." *Belle State Bank v. Industrial Commission, Division of Employment Security, supra* at 847. If every employee could resign and draw unemployment compensation simply because of a slight increase in his duties, the system's solvency would be imperiled and employees legitimately entitled to unemployment compensation would suffer.

The judgment is reversed.

REINHARD, P. J., and CRIST, J., concur.