**BACKER'S POTATO CHIP COMPANY, Plaintiff-Appellant,**

v.

**LABOR AND INDUSTRIAL RELATIONS COMMISSION OF MISSOURI, Missouri Division of Employment Security, and Leonard Dwayne Braden, Defendants-Respondents.**

**No. WD 35,078.**

Missouri Court of Appeals, Western District.

Oct. 23, 1984.

Michael P. Burke, Bryan, Cave, McPheeters & McRoberts, St. Louis, for plaintiff-appellant.

Larry R. Ruhmann and Rick V. Morris, Jefferson City, for Div. of Employment Sec.

Timothy P. Duggan, Jefferson City, for Labor & Indus. Relations Com'n of Mo.

Before TURNAGE, C.J., and SOMERVILLE and MANFORD, JJ.

TURNAGE, Chief Judge.

Leonard Braden filed a claim for unemployment benefits under Chapter 288, RSMo 1978. A deputy in the Division of Employment Security determined Braden was eligible for benefits, and the Appeals Tribunal, the Labor and Industrial Relations Commission, and the circuit court affirmed that decision.

On this appeal, Backer contends Braden did not have good cause for voluntarily leaving his employment. Reversed.

The facts are not disputed. Backer's Potato Chip Company employs about 45 people in Fulton, where it produces and distributes potato chips. Braden worked for Backer's for about two years, primarily as the operator of the potato chip cooker.

Backer's had considered Braden a good employee, and had rated his work as gener-

ally satisfactory until shortly before May of 1981, when the company apparently installed a new potato chip cooker. On Tuesday, May 12, 1981, Braden operated the cooker improperly, causing it to become overloaded and stop. Because the cooker was out of operation, the entire plant was shut down. William E. Backer, the company president, was involved in correcting the problem, but no untoward incident occurred as a result of the shutdown.

The next day, Wednesday, Braden inadvertently jammed the top of the cooker against the hoist mechanism so that the top could not be lowered into place. This resulted in expensive repairs to the cooker and a costly loss of production. Again, the president was involved in making repairs, and he expressed no anger toward Braden.

The next day, Thursday, Braden was operating the cooker when the president discovered the shortening level in the cooker was too high, resulting in improperly cooked chips that were virtually useless. At this time the president became angry, and stated, using profane terminology, that Braden should pay more attention to his job. He also suggested, using more profanity,[1] that Braden should transfer to another job in the plant. The president did not call Braden any names, profane or otherwise. After this problem was resolved, the president reassured Braden that things were all right, but that the cooker should be maintained at a temperature of 375°. Later that day, the president and the general manager advised Braden that they had concluded he was not really suited to operate the new cooker, and he should look around the plant for another job he would like to do.

On Friday, Braden called in sick and did not report to work.

On Monday, Braden reported for work, but knew he would not be operating the cooker, so he reported to the plant manager. The plant manager was training a new cooker operator, so Braden was told to perform "picker" duty at the discharge end of the cooker. The president came to the cooker shortly after and observed that the chips were being cooked improperly. He observed that the cooker was being operated at 340°, instead of 375°. The plant manager had been on vacation the preceding week and was thus not aware that the proper cooking temperature was 375°. The president became angry and asked Braden why he had not told the plant manager that the proper temperature for the cooker was 375°. The president did not use profanity, but he did speak in a loud voice. His statements to Braden were soon overshadowed by a strong discussion between the president and the plant manager. At the conclusion of this episode, Braden walked out of the plant and did not return to work. The next day, Braden filed his claim for unemployment compensation.

About two weeks after Braden left his employment, the general manager offered Braden a job as quality control inspector at the plant. He explained to Braden that the company believed this job was more suitable to Braden's abilities, and that he would have little contact with the president. Braden refused the offer. The company later offered Braden the same job through the Division of Employment Security, but Braden again refused the offer.

■ Under § 288.050.1(1), RSMo 1978, Braden is disqualified from receiving unemployment benefits if he voluntarily left his work without good cause attributable to his work or to his employer. "Whether the favorable evidence establishes good cause is a question of law and this court is not bound by the decisions of the Commission." *St. Louis Housing Authority v. Labor and Industrial Relations Commission*, 639 S.W.2d 415, 416–17[1, 2] (Mo.App.1982). In *Belle State Bank v. Industrial Commission*, 547 S.W.2d 841, 846–47[5] (Mo. App.1977) (footnotes omitted), the court stated:

---

**1.** The president told Braden to get the d＿＿ out of his a＿ and that he had better find another f＿＿＿ job in the plant.

To constitute good cause, the circumstances motivating an employee to voluntarily terminate employment must be real not imaginary, substantial not trifling, and reasonable not whimsical, and *good faith* is an essential element. The standard as to what constitutes good cause is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive.

The court also stated:

Obviously, "good cause," as used in the Law, should and does contemplate and require a cause reasonably sufficient to justify an employee in voluntarily leaving the ranks of the employed and joining the ranks of the unemployed, or, otherwise stated, a cause which reasonably would motivate the average able-bodied and qualified worker in a similar situation to terminate his or her employment with its certain wage rewards in order to enter the ranks of the compensated unemployed.

547 S.W.2d at 846[4] (citations omitted).

Neither party has cited any Missouri case involving similar facts, however, an annotation discusses the problem of abusive language alone as good cause for an employee to leave employment. *See* Annot., 76 A.L.R.3d 1089 (1977). The annotation notes that when the only mistreatment involved was the employer's use of abusive language toward the employee, the courts have held that the employee had not established good cause for quitting. *Id.* at 1098. Of the cases cited, the one most on point is *Uniweld Products, Inc. v. Industrial Relations Commission*, 277 So.2d 827 (Fla.Dist. Ct.App.1973). The employee in that case had been employed for some time and had been unhappy because the company president spoke in a loud voice. The claimant had made mistakes which caused the president to yell at her. The evidence was that the president habitually spoke in a loud voice and when he became dissatisfied with an employee he yelled at the employee. The court reversed a finding that the claimant had good cause to leave her employ-

ment, and held that she did not have good cause. *Id.* at 829.

In *Stewart v. Department of Industrial Relations*, 40 Ala.App. 383, 114 So.2d 274 (1959), the supervisor used profanity in criticizing the employee's work, although he did not call the employee any profane names. In fact, the language he used appears to be similar to the president's language in this case. In *Stewart*, the administrative office denied the compensation claim. The court affirmed this decision on appeal, and noted that the employee had not brought her supervisor's language to the attention of his superiors. 114 So.2d at 276[4].

In *Gordon v. Unemployment Compensation Board of Review*, 44 Pa.Commw. 270, 403 A.2d 235 (1979), the company president falsely accused the employee of wrongly issuing a two thousand dollar check. The president also used vulgar terms and "mild expletives," directed at her over a six-month period. The employee told the president that she did not like his language and he told her that, if she objected, she could leave. 403 A.2d at 236. The Compensation Board had found that the employer had used a "vulgar term in a parenthetical type fashion" and had "used several mild expletives which were not directed to anyone personally." *Id.* The Board found that the language was not so offensive as to have caused the employee to terminate her position, and denied her unemployment benefits. The court affirmed the Board's findings. *Id.*

In the case at bar, the president became angry the third time Braden caused the cooker to become inoperative, thereby stopping plant production. Although the president used profanity, he did not call Braden any obscene name. From the language used by plant employees' in their testimony before the Appeals Tribunal, it is apparent that many employees at Backer's used profanity. This court infers from this that the use of profanity in the plant is commonplace.

■ While no one would dispute that an employee should not be mistreated, this

court concludes that the president's language used in this case on one occasion did not constitute good cause for Braden to leave his employment. It is apparent that Braden did not consider the incident on Thursday to be sufficiently offensive for him to leave his employment, because he returned to work on Monday. On Monday, the president did not use any profanity, but he did raise his voice in anger when he discovered that Braden had not told the plant manager the proper temperature at which the cooker was to be operated. Nothing in the occurrence on Monday gave Braden good cause to leave his employment.

This court further notes that employees are generally required to attempt to resolve differences with their employers before leaving their employment. *See Division of Employment Security v. Labor and Industrial Relations Commission,* 636 S.W.2d 361, 364 (Mo.App.1982). Braden should have at least advised the president that he did not like his use of profanity, and attempted to obtain an agreement that the president would not use profanity in Braden's presence.

The judgment is reversed and this cause is remanded to the circuit court with directions to remand this cause to the Labor and Industrial Commission with directions to enter a finding that Braden did not leave his employment with good cause and is therefore ineligible for benefits.

All concur.