Joy NEWLAND, Petitioner
and Appellant,

v.

JOB SERVICE NORTH DAKOTA, and
Dakco Distributing, Inc., d.b.a. Dakota
Drug, Inc., Respondents and Appellees.

Civ. No. 890348.

Supreme Court of North Dakota.

Aug. 9, 1990.

Richard Roy LeMay (argued), Legal Assistance of North Dakota, Minot, for petitioner and appellant.

David Ernest Clinton (argued), Asst. Atty. Gen., Bismarck, for respondent and appellee Job Service North Dakota.

Jonathan C. Eaton of Eaton, Van de Streek & Ward, Minot, for respondent and appellee Dakota Drug, Inc. Submitted on brief.

LEVINE, Justice.

Joy Newland appeals from a district court order affirming Job Service's decision denying unemployment compensation benefits. We reverse and remand to the agency.

Newland, a resident of Burlington, North Dakota, was employed for approximately one-and-a-half years as a utility clerk and order filler for Dakota Drug, Inc., a wholesale supply company in Minot. Her work hours were from 7:30 a.m. until 4:30 p.m. On January 1, 1989, Newland was informed that as of February 26, her hours of employment would change. Her new shift would run from at least 4:30 p.m. until 8:30 p.m. or later, as required to complete the work. The change in shift did not involve either an increase or reduction in hours because Newland was to come in early or work later as necessary to maintain her customary forty-hour work week. However, the time when work was to begin or end each day was unpredictable and uncertain.

On February 27, Newland filed a claim for unemployment benefits, stating, "The company went to night filling. My husband works nights and with three children it would not work out for me to work nights."

Job Service denied unemployment benefits, concluding that Newland left her employment without good cause attributable to her employer. The agency found that Newland quit because, in light of the cost of child care in her community, "it was not economically practical for her to continue to work." The agency reasoned that parental obligations were personal reasons that lacked an objective nexus with employment so as to constitute good cause attributable to the employer.

Newland attacks that finding as incomplete, claiming that economics was not the only cause for leaving and argues that the agency erred in concluding that she voluntarily quit her job without good cause attributable to her employer. We agree.

Section 28–32–19, NDCC, governs the scope of our review of administrative agency decisions. The question whether a claimant quit without good cause attributable to her employer is a factual conclusion. *Erovick v. Job Service North Dakota*, 409 N.W.2d 629, 631 (N.D.1987). Our review of factual conclusions is limited to a determi-

nation of whether those findings of fact are supported by a preponderance of evidence. *Id.* We do not make independent findings of fact or substitute our judgment for that of the agency but determine only whether a reasoning mind could have reasonably determined that the factual conclusion was supported by the weight of the evidence. *Id.* Questions of law are fully reviewable. *Batla v. N.D.S.U.*, 370 N.W.2d 554, 557 (N.D.1985).

■■■ Two statutes, sections 52–01–05 and 52–06–02, guide our review of Job Service's decision. Section 52–01–05 declares the public policy supporting a system of unemployment compensation in our State. It provides:

"Involuntary unemployment creates a hardship on the unemployed worker and his family and leads to a state of economic insecurity. Relief from problems of involuntary unemployment imposes a statewide burden of serious consequence to the people of the state of North Dakota which can best be met by unemployment insurance for the working man who becomes unemployed through no fault of his own. The legislative assembly, therefore, declares that the public good and general welfare of the citizens of the state requires that for laboring people genuinely attached to the labor market there be a systematic and compulsory setting aside of financial reserves to be used as compensation for loss of wages during periods when they become unemployed through no fault of their own."

Thus, under the statute, as long as a worker exhibits a genuine commitment to working and is unemployed through no fault of his or her own, that worker is entitled to receive unemployment compensation. *See Perske v. Job Service North Dakota*, 336 N.W.2d 146 (N.D.1983). It is the public policy of this State to soften the harsh impact of involuntary unemployment.

Tempering that public policy is section 52–06–02 which limits the availability of benefits:

"An individual is disqualified for benefits:

"1. For the week in which he has left his most recent employment voluntarily without good cause attributable to the employer, and thereafter until such time as he:

"a. Can demonstrate that he has earned remuneration for personal services in employment equivalent to at least eight times his weekly benefit amount as determined under section 52–06–04; and

"b. Has not left his most recent employment under disqualifying circumstances."

This section relieves employers from responsibility for benefits to employees who quit for causes unconnected with work. *See Lord v. Job Service North Dakota*, 343 N.W.2d 92 (N.D.1984).

■■■ We construe together statutes relating to the same subject matter so as to harmonize them if possible and give full force and effect to legislative intent. *Dickinson Pub. Sch. Dist. No. 1 v. Scott*, 252 N.W.2d 216, 219 (N.D.1977). We believe sections 52–01–05 and 52–06–02 indicate that the Legislature, in enunciating a public policy to provide unemployment compensation, intended to strike a balance between the rights of the unemployed worker who genuinely wants to work, contained in section 52–01–05, and the protection of the former employer from quits that have nothing to do with the employer or the employment, furthered by section 52–06–02. Job Service, in determining eligibility for compensation, must be attuned to that balance, and so must we. However, because unemployment compensation laws are remedial legislation, the balance should be struck in favor of the employee. *E.g., Holman v. Olsten Corp.*, 389 N.W.2d 236, 238 (Minn. Ct.App.1986); *McClain v. State Dept. of Indus. Relations*, 405 So.2d 34 (Ala.Civ. App.1981); *Osterhout v. Everett*, 6 Ark. App. 216, 639 S.W.2d 539 (1982); *Stern v. Industrial Comm'n*, 667 P.2d 244 (Colo.Ct. App.1983). *Cf. e.g., Lass v. N.D. Work. Comp. Bureau*, 415 N.W.2d 796 (N.D.1987) [workers compensation Act is construed liberally in favor of injured workers extending benefits to all who can fairly be

brought within them]. Remedial statutes must be liberally construed in favor of the purposes obviously intended. *Smith v. Hoff*, 20 N.D. 419, 127 N.W. 1047 (1910).

Obviously, both Job Service and this Court must construe the governing statutes to promote the public policy of this State. Unemployment benefits are to be awarded to those "laboring people genuinely attached to the labor market" who become unemployed "through no fault of their own." NDCC § 52–01–05; *Perske v. Job Service North Dakota*, 336 N.W.2d 146 (N.D.1983).

Newland introduced evidence of three reasons for her quitting:

1. A substantial change in work hours;
2. The unavailability of child care in her community after 7:00 p.m.; and
3. The prohibitive cost of child care.

 Where a claimant has adequately informed the agency of all her asserted reasons for quitting, she is entitled to have Job Service consider each of those reasons. *Taylor v. Iowa Dept. of Job Service*, 362 N.W.2d 534, 539 (Iowa 1985). Nothing in our unemployment compensation law suggests that a claimant must rest her entire claim to compensation on one reason for quitting a job. Indeed, in *Sonterre v. Job Service North Dakota*, 379 N.W.2d 281 (N.D.1985), Job Service considered all three reasons given by the claimant for quitting and we upheld the agency's decision that none of the reasons was attributable to the employer. One of the reasons Sonterre alleged for the quit was insufficient notice of the shift change. We upheld, inter alia, the agency's factual determinations that Sonterre was given sufficient notice to adjust to her new shift by arranging for child care and her quit was therefore not for good cause attributable to the employer. A reasonable implication of these findings is that had the employer given unreasonably short notice resulting in Sonterre's inability to secure child care, thereby necessitating her leaving work, the result would have been different. Although child care may not by itself be a condition attributable to the employer, it may in combination with other factors constitute good cause for quitting attributable to the employer.

 Thus, where several reasons are asserted, Job Service must consider all reasons which may have combined to give the claimant good cause to quit, then consider whether any of those reasons was a cause attributable to the employer. *Id., Taylor*, 362 N.W.2d at 541. *See also Eckart v. Industrial Claims Appeals Office*, 775 P.2d 97 (Colo.Ct.App.1989). If any good-cause reason, supported by sufficient evidence, is attributable to the employer, then benefits should be awarded notwithstanding the existence of other disqualifying reasons. However, in order to qualify for benefits, the employee must have made a good faith effort to remain "attached to the labor market" but did not succeed through "no fault" of her own. *See* NDCC § 52–01–05. "Fault" in the context of section 52–01–05 means failure to make reasonable efforts to preserve one's employment. We believe that this procedure promotes the public policy that unemployment compensation be provided to persons unemployed through no fault of their own. It also implements the principle that remedial statutes be construed liberally to effectuate the public policy articulated in them.

 In the instant case, Job Service purported to find but one reason for Newland's leaving, the prohibitive cost of child care in her community. We agree with Job Service that ordinarily, the prohibitive cost of child care, like the need to arrange child care so one may work, is not, under our law, the employer's responsibility. *See Sonterre v. Job Service North Dakota, supra*.

 However, a change in one's work hours is attributable to the employer. "Attributable to the employer" means "produced, caused, created or as a result of actions by the employer." *Couch v. North Carolina Emp. Sec. Comm'n*, 89 N.C.App. 405, 366 S.E.2d 574, 577 (1988). A change in work schedule is "produced, caused or created" by the entity which drafts the new schedule and imposes it. Because it was Newland's employer which set the new work schedule, the change in Newland's

hours is attributable to the employer. *See Couch*, 366 S.E.2d at 577.

Job Service, relying on dictum in *Sonterre*, 379 N.W.2d at 284, argues that a change in one's working shift when there is not a corresponding increase in total hours worked does not constitute good cause attributable to the employer. Although this Court has not previously defined "good cause" in the context of unemployment compensation, "good cause" has been defined elsewhere as a reason for abandoning one's employment which would impel a reasonably prudent person to do so under the same or similar circumstances.[1] *E.g., Aschenbrenner v. Employment Division*, 29 Or.App. 345, 563 P.2d 757, 759 (1977); *Green v. District of Columbia Dept. of Emp.*, 499 A.2d 870, 877 (D.C.1985). This is the definition adopted by Job Service in its final decision disqualifying Newland and will serve our analysis here.

 A shift change which results in an increase in total hours, as we stated in *Sonterre*, constitutes good cause for leaving. *Sonterre*, 379 N.W.2d at 284. *See also Wade v. Hurley*, 33 Colo.App. 30, 515 P.2d 491 (1973); *Louisiana Dept. of Corrections v. Administration, La. Office of Emp. Sec.*, 457 So.2d 825 (La.Ct.App.1984); *Banks v. Elledge*, 535 So.2d 808 (La.Ct. App.1988). But so, too, might a decrease in hours with accompanying reduction in pay, give an employee good cause to quit. *E.g., Tombigbee Lightweight Aggreg. Corp. v. Roberts*, 351 So.2d 1388 (Ala.Civ. App.1977); *Kyle v. Beco Corp.*, 109 Idaho

267, 707 P.2d 378 (1985); *Tate v. Mississippi Emp. Sec. Comm'n*, 407 So.2d 109 (Miss.1981); *Couch v. North Carolina Emp. Sec. Comm'n*, 89 N.C.App. 405, 366 S.E.2d 574 (1988); *Brewster v. Rutledge*, 342 S.E.2d 232 (W.Va.1985) (per curiam).

 We did not mean to imply in *Sonterre* that an increase in hours is the sine qua non for finding that a shift change constitutes good cause. Where the change in hours is substantial, even if there is not an increase in total hours worked, it may constitute good cause attributable to the employer. *See Markert v. National Car Rental*, 349 N.W.2d 859 (Minn.Ct.App. 1984); *Montclair Nursing Center v. Wills*, 220 Neb. 547, 371 N.W.2d 121 (1985); *Quillen v. Review Bd. Ind. Emp. Sec.*, 468 N.E.2d 238 (Ind.Ct.App.1984); *Baker v. Fanny Farmer Candy Shops*, 394 N.W.2d 564 (Minn.Ct.App.1986); *Garman v. State Emp. Sec. Dept.*, 102 Nev. 563, 729 P.2d 1335 (1986).

In *Sonterre*, there was no evidence and no argument that the change in shift was substantial in and of itself or that it created a burden for Sonterre. In that case, Sonterre was informed that her 8:00 a.m.–4:30 p.m. shift was to be changed to 10:00 a.m.–6:30 p.m. Sonterre would report to work only two hours later in the morning and leave work only two hours later in the evening. She needed child care but failed to make any effort to find it. We held on those facts that Sonterre left without good cause attributable to her employer.

---

**1.** Other jurisdictions define good cause similarly:

KENTUCKY: *Kentucky Unemp. Ins. Comm'n v. Murphy*, 539 S.W.2d 293, 294 (Ky.1976) (per curiam) [exists only when worker is faced with circumstances so compelling as to leave no reasonable alternative but loss of employment].

IDAHO: *Meyer v. Skyline Mobile Homes*, 99 Idaho 754, 589 P.2d 89, 93 (1979) [test is whether reasonable person would consider circumstances resulting in unemployment to be real, substantial and compelling].

MAINE: *Merrow v. Maine Unemploy. Ins. Comm'n*, 495 A.2d 1197, 1201 n. 2 (Me.1985) [pressure of real not imaginary, reasonable not whimsical, circumstances compels decision].

MISSOURI: *Div. of Emp. Sec. v. Labor & Indus. Relations Comm'n*, 636 S.W.2d 361, 364

(Mo.Ct.App.1982) [cause reasonably would motivate average able-bodied and qualified worker in similar situation to terminate his or her employment with its certain wage rewards in order to enter ranks of compensated unemployed].

NEW JERSEY: *Inside Radio/Radio Only, Inc. v. Board of Review*, 204 N.J.Super. 296, 498 A.2d 791, 793 (1985) [cause sufficient to justify employee's voluntarily leaving ranks of employed and joining ranks of unemployed].

NORTH CAROLINA: *Couch v. North Carolina Emp. Sec. Comm'n*, 89 N.C.App. 405, 366 S.E.2d 574, 577 (1988) [a reason which would be deemed by reasonable men and women valid and not indicative of an unwillingness to work] quoting *Intercraft Indus. Corp. v. Morrison*, 305 N.C. 373, 376, 289 S.E.2d 357, 359 (1982).

■ Our dictum in *Sonterre* should be interpreted to stand for the proposition that if a change in hours does not create an increase in hours, then it must create a comparable burden to justify an employee's leaving. *E.g., McDonald v. Lockwood,* 424 So.2d 356 (La.Ct.App.1982).

■ Newland's shift change is markedly different from the shift change involved in *Sonterre.* In effect, Newland would be required to be available on an on-call basis. She would not know long in advance when to report to work before 4:30 p.m. nor how long to stay past 8:30 p.m. At some point in the work week, the proposed schedule would necessarily require her to work longer than eight hours a day.

Although Job Service did not make findings related to the substantiality of Newland's shift change, we hold as a matter of law that the change was substantial. There was no evidence supporting a finding that the shift change was anything but substantial. Even though we do not make findings, we believe that a reasoning mind on the weight of this evidence, could not have found anything other than a substantial change in shift.

A substantial shift change is good cause attributable to the employer. It was one of the reasons given for Newland's quitting. It led to the need for child care. The question arises whether Newland made a good faith effort to preserve her employment in the face of the substantial shift change. If she did, then benefits should be awarded. Newland argues that she attempted to find child care so that she might continue to work but that, because she lived in a small town, child care was unavailable after 7:00 p.m. Yet, Newland's employer required employment at least until 8:00–8:30 p.m. and later if necessary to complete the filling of orders. Newland's schedule was both uncertain and unpredictable. She argues that despite the upheaval in her job, she made every effort to preserve her employment. This distinguishes Newland's case from that in *Sonterre* where the claimant made no effort to find child care to accommodate her new

schedule but quit soon after learning of the shift change.

Under section 52–01–05, an unemployed worker is entitled to receive benefits if she is unemployed through no fault of her own and is a person genuinely attached to the labor market. By contrast, an unemployed person is not entitled to benefits if she quits voluntarily without good cause attributable to the employer. NDCC § 52–06–02.

■ Job Service made no findings relevant to Newland's efforts to find child care or the availability of child care, factual issues which go to the question of Newland's attachment to the labor market and lack of fault in becoming unemployed.

The genuine attachment to the labor market, referred to in section 52–01–05, may be evidenced by the effort an employee exerts to preserve her employment and is evidence that an employee's unemployment is not caused by her own fault. *See Backer's Potato Chip Co. v. Labor & Indus. Relations Comm'n,* 679 S.W.2d 909 (Mo.Ct.App.1984); *Evasovich v. Commonwealth, Unemp. Comp. Bd. of Review,* 80 Pa.Cmwlth. 395, 471 A.2d 921 (1984); *Davis v. Board of Review,* 125 Ill.App.3d 67, 80 Ill.Dec. 464, 465 N.E.2d 576 (1984). Whether Newland's effort in this case was sufficient to establish that she was unemployed through no fault of her own depends upon whether, after diligent inquiry, child care was, in fact, unavailable in her community.

We, therefore, remand to Job Service for findings on the questions whether child care was available in Newland's community during the hours corresponding to her work schedule and whether Newland exercised a good faith effort to find child care. If the agency finds that child care was unavailable, after good faith effort to secure it, it should confer benefits because Newland, having made an effort to preserve her employment, is not unemployed through fault of her own. On the other hand, if the agency finds child care was available, Newland would not qualify for benefits because, where child care is avail-

able, it is the responsibility of the working parent to obtain it.

Accordingly, we reverse the district court's order affirming the denial of benefits and remand to Job Service. Consistent with this opinion, Job Service is directed to make findings on the questions of Newland's good faith effort to seek child care and the availability of child care and to redetermine whether Newland quit for a reason which would permit her to receive benefits.

ERICKSTAD, C.J., and VANDE WALLE, GIERKE and MESCHKE, JJ., concur.