Michelle ESSELMAN, Petitioner and Appellant,

v.

JOB SERVICE NORTH DAKOTA, and North Dakota Department of Human Services, Respondents and Appellees.

Civil No. 960006.

Supreme Court of North Dakota.

May 29, 1996.

Richard R. LeMay, Legal Assistance of N.D., Minot, for petitioner and appellant.

Douglas A. Bahr, Assistant Attorney General, Attorney General's Office, Bismarck, for respondent and appellee Job Service North Dakota.

Tag C. Anderson (appearance), Assistant Attorney General, Attorney General's Office, Bismarck, for respondent and appellee North Dakota Department of Human Services.

SANDSTROM, Justice.

Michelle Esselman appealed from a district court judgment affirming Job Service North Dakota's denial of her claim for unemployment benefits. We conclude a preponderance of evidence supports Job Service's finding Esselman voluntarily quit her job without good cause attributable to her employer, and we affirm the judgment.

I

For over seven years Esselman was employed by the North Central Human Service Center (North Central), the Minot district office of the Department of Human Services, as a licensed addiction counselor. She resigned effective January 31, 1995, and applied for unemployment benefits, claiming she quit her job for "stress related medical problems." A claims analyst denied Esselman's request for benefits, and Esselman sought an administrative review of the decision.

After a telephone hearing, an administrative referee found "the conditions of [Esselman's] employment had become significantly unfavorable to the extent that she could no longer continue working" and concluded Esselman left her employment with good cause attributable to her employer, entitling her to receive unemployment benefits. North Central requested a review by the Executive Director of Job Service, who rejected the referee's decision and concluded, in relevant part:

"In this case, while the claimant was dissatisfied with working conditions, evidence in the record does not establish that the conditions were of a nature or extent so as to be considered good cause attributable to the employer for voluntarily leaving employment. The employer made a good faith attempt to resolve the situation by arranging a retreat and for employee assistance.... Under these circumstances, the claimant has not established good cause attributable to the employer for voluntarily leaving employment."

Esselman appealed to the district court, which upheld the Executive Director's decision. Esselman then appealed to this Court.

The appeal from the administrative agency decision to the district court was timely under N.D.C.C. § 52–06–27. The district court had jurisdiction under N.D. Const. Art. VI, § 8, and N.D.C.C. § 52–06–27. Esselman's appeal from the district court to this Court was timely under N.D.C.C. § 52–06–27 and N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. Art. VI, § 6, and N.D.C.C. § 52–06–27.

## II

 N.D.C.C. § 28–32–19 sets the standard for reviewing an appeal from an administrative agency decision. We review the decision of the agency, not the decision of the district court. *Lambott v. Job Service North Dakota,* 498 N.W.2d 157, 158 (N.D.1993). Under N.D.C.C. § 28–32–19, we affirm the agency decision unless one of the six enumerated reasons exists for overturning it. We sustain the agency's findings of fact unless they are not supported by a preponderance of the evidence and uphold the agency's conclusions of law unless they are not supported by its findings of fact. *Lovgren v. Job Service North Dakota,* 515 N.W.2d 143, 145 (N.D.1994). We do not make independent findings of fact or substitute our judgment for that of the agency, but decide only whether a reasoning mind could have reasonably decided the agency's factual conclusions were proved by the weight of the evidence. *Tehven v. Job Service North Dakota,* 488 N.W.2d 48, 49 (N.D.1992); *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214, 220 (N.D.1979).

 Under N.D.C.C. Ch. 52–06, a worker who exhibits a genuine commitment to working and is unemployed through no fault of her own is entitled to receive unemployment compensation. N.D.C.C. §§ 52–01–05 and 52–06–01; *Newland v. Job Service North Dakota,* 460 N.W.2d 118, 121 (N.D.1990). Under N.D.C.C. § 52–06–02, however, a worker is disqualified from receiving benefits

if she voluntarily quits employment without good cause attributable to the employer. In *Newland* at 122–23, this Court addressed the meaning of the phrases "attributable to the employer" and "good cause:"

> " 'Attributable to the employer' means 'produced, caused, created or as a result of actions by the employer.'
>
> * * *
>
> "Although this Court has not previously defined 'good cause' in the context of unemployment compensation, 'good cause' has been defined elsewhere as a reason for abandoning one's employment which would impel a reasonably prudent person to do so under the same or similar circumstances."

The question whether a claimant quit without good cause attributable to the employer is a "factual conclusion." *Lipp v. Job Service North Dakota,* 468 N.W.2d 133, 134 (N.D. 1991). To qualify for unemployment benefits, the employee has the burden of proving she quit her job for good cause attributable to the employer. *Erovick v. Job Service North Dakota,* 409 N.W.2d 629, 630 (N.D. 1987).

## III

Esselman claims her resignation was for good cause attributable to North Central because she was treated unprofessionally, verbally attacked and intimidated by coworkers during group meetings, and was "scapegoated" by coworkers as a source of office conflict. Esselman testified those stressful working conditions caused her to suffer physical symptoms, including migraine headaches and stomach problems, which ultimately led to her resignation. Esselman does not argue she met the requirements for a medical exception to benefit disqualification under N.D.C.C. § 52–06–02(1).[1] Job Service found the lack of communication and conflict in the office was not attributable to or the fault of North Central. Job Service also found North Central made good faith attempts to resolve the problems among the office staff, but Esselman voluntarily quit before North

---

1. Contrary to the impression created by the dissent, a "medical quit" under the statute was not claimed nor were the statutory requirements for a medical quit followed. Under N.D.C.C. § 52–ad 06–02(1), "medical quit" and "good cause attributable to the employer" are separate and distinct provisions of the law.

Central had a chance to resolve the identified problems.

There were communication problems and conflict among coworkers for over a year before Esselman quit. A new supervisor, hired at North Central in February 1994, stressed teamwork and communication. Nevertheless, communication and cooperation among the coworkers continued to deteriorate. The office director scheduled a retreat in April 1994 for employees to address the situation. Esselman testified she was "verbally attacked on several different occasions" at the retreat and felt intimidated when one of her coworkers angrily yelled at her. In November 1994, the office director engaged St. Alexius, which sponsors an employee assistance program, to meet with the employees to resolve their conflicts and communication problems. At the first meeting 15 issues were identified, and it was decided a meeting each month would be held to address a different problem area.

About this time, Esselman and two coworkers wrote a letter to H.C. Wessman, the Director of the Department of Human Services, complaining about the stressful working relationships in their district office. The letter is not in the record and there is no showing it constituted an attempt to initiate formal grievance procedures. Wessman responded to the letter, stating he was in favor of the "proactive stance" the office director was taking in getting help through the St. Alexius employee assistance program. He indicated the workers could write again if they had further concerns. Employee assistance meetings were held in December 1994 and in January 1995. At the January meeting, employees were informed about the letter Esselman and her coworkers had written to Wessman. Some of the workers bluntly expressed their opinion that sending the letter demonstrated poor judgment and an act of insubordination. Esselman claimed she was being targeted at the meeting as a troublemaker by her coworkers and was "being scapegoated for all the team problems."

## IV

This Court has not before addressed the question of what constitutes good cause attributable to an employer in the context of an employee quitting a job primarily because coworkers cannot get along with one another. Cases from other jurisdictions addressing this issue provide useful insight and guidance.

An employee does not have good cause attributable to an employer to quit a job merely because the employee experiences irreconcilable differences with coworkers or is frustrated or dissatisfied with working conditions. *Portz v. Pipestone Skelgas,* 397 N.W.2d 12, 14 (Minn.App.1986). If, however, an employee is being harassed by coworkers, the employee may have good cause to quit if the employer has notice of the harassment but fails to take timely and appropriate measures to prevent it. *Hanke v. Safari Hair Adventure,* 512 N.W.2d 614, 618 (Minn.App. 1994) (employee who was harassed by coworkers because of his sexual orientation had reasonable cause to quit his job when his employer did not give him any reasonable expectation of assistance to solve the problem); *Wetterhahn v. Kimm Co.,* 430 N.W.2d 4, 6 (Minn.App.1988) (employee who was victim of ongoing swearing and yelling by coworker had good cause to quit when her employer had notice of the harassment and failed to take measures to stop it); *Curry v. Gatson,* 180 W.Va. 272, 376 S.E.2d 166, 169 (1988) (employee who quit her job because of sexual and racial harassment by coworkers had good cause attributable to her employer); *Tru–Stone Corp. v. Gutzkow,* 400 N.W.2d 836, 839 (Minn.App.1987) (employee whose coworkers taunted and harassed him by calling him names and drawing uncomplimentary pictures of him with profanities written underneath had good cause to quit his job when his employer failed to respond to the situation); *Turco v. Dep't of Employment Security,* 141 Vt. 135, 446 A.2d 345, 347 (1982) (employee harassed by coworkers about his religious beliefs had good cause to quit when his employer acted with callous indifference and refused to address the problem).

Unlike the circumstances in the foregoing cases, Esselman does not claim she was being taunted, teased, or harassed by coworkers. Her subjective feelings of being intimi-

dated and verbally attacked occurred in very limited circumstances during group meetings held for the specific purpose of having candid discussions to resolve employee conflict. A fair summary of Esselman's testimony is that she suffered stress at work because she and her coworkers simply could not communicate or get along. They ultimately split into factions or cliques with unresolved conflict and anger among them.

An administrative secretary testified the stress and tension in the office was primarily caused by "a lack of communication" and "[m]aybe some personality conflicts." She said Esselman and two other employees were singled out by the others as "the individuals that were creating the problems or creating the stressful situation."

Esselman testified she did not tell her direct supervisor or her next level supervisor she felt she was being treated unfairly by coworkers. She did, however, discuss with the next level supervisor her feelings of stress and frustration at work. That supervisor asked Esselman, "What do you think we could do to improve this?" Esselman responded, she "really didn't know." That supervisor testified she believed Esselman and a coworker, Marilyn Carlson, were part of the problem because they "were sometimes very critical of the other staff members," were "[n]ot as supportive of the other unit members," and "[a]t times, they were condescending to ... the other staff members." That supervisor also testified she asked Esselman if she would like to work in a new women's program at North Central, but Esselman responded, "she could not work with [a certain team member]. That she was ... unable to trust her and so consequently she would not be able to work with her."

Esselman relies on the case of *Richards v. Daniels*, 1 Ark.App. 331, 615 S.W.2d 399 (1981), to support her claim she quit for good cause attributable to her employer. In *Richards*, a kindergarten teacher was harassed by a principal and other teachers when she refused to sign a petition against the school's superintendent. After she refused to sign the petition, the principal and teachers failed to notify her of meetings, failed to give her messages, and refused to assist her when she had problems with students. The principal scheduled Richards' rest break at the end of the school day and then sent "one-sided, bad reports" about her to the superintendent. For three years Richards asked to be transferred to another grade within the school system, but her requests were refused on the ground she was best qualified for her kindergarten teacher position. Richards finally resigned and was denied unemployment benefits because she had voluntarily quit. The Arkansas Court of Appeals, awarding Richards' unemployment benefits, concluded she proved her resignation was for good cause attributable to her employer. The court found Richards was mistreated by coworkers for a considerable period of time and that she had made reasonable but unsuccessful efforts to resolve the conflict by requesting a transfer within the school system. The court concluded a reasonable person in Richards' circumstances would have been compelled to quit.

*Richards* is clearly distinguishable from the circumstances here. Esselman was not subjected to the type of harassment by coworkers as Richards experienced. Unlike Richards, who did nothing to provoke mistreatment by the principal or other teachers, there is evidence Esselman was as much or more the cause of the office conflict as any other employee. Furthermore, unlike Richards' employer, who refused Richards' suggested transfer and failed to seek any other solution to the ongoing harassment Richards was experiencing, Esselman's office director intervened to resolve the office problems. He scheduled a retreat in an attempt to identify and resolve the problems. He then hired St. Alexius to provide services, through its employee assistance program, to identify and address staff problems over a period of time. Esselman's resignation after the second meeting short-circuited the program and prevented any chance of its future success.

Having reviewed the record, we conclude a reasoning mind could have reasonably determined, as did Job Service in this case, Esselman failed to prove her resignation was the result of good cause attributable to her employer. The Job Service findings of fact are

supported by a preponderance of the evidence, and its conclusions of law are supported by its findings of fact.

## V

 Esselman also claims she was denied a fair hearing because Job Service considered an ex parte communication by the office director. In requesting a review of the referee's recommendation, the office director submitted a memorandum explaining his position on the issues. Esselman was provided a copy of the memorandum, and she had ample opportunity to respond to it. Furthermore, Esselman's counsel was unable to demonstrate the Job Service Executive Director, in reviewing the referee's decision, relied upon any substantive fact contained in the memorandum which was not also part of the record evidence. A person is denied due process or a fair hearing when the defects in the hearing process might lead to a denial of justice. *Erovick v. Job Service North Dakota*, 409 N.W.2d 629, 631 (N.D.1987). We are not convinced a denial of justice occurred in this hearing process. We conclude the agency did not impermissibly rely upon the memorandum and did not deny Esselman a fair hearing.[2]

## VI

The district court judgment upholding Job Service's denial of Esselman's claim for unemployment benefits is affirmed.

VANDE WALLE, C.J., and NEUMANN, J., concur.

MARING, Justice, concurring in the result.

I write separately to point out that the majority opinion should not be read to condone all of the actions of Esselman's employers. Evidence in the record suggests that Esselman was not only treated unprofessionally by her fellow workers, but also by her supervisors. When supervisors treat an employee unprofessionally, verbally attack and intimidate her, and permit co-employees to do the same, the employee is put in an especially vulnerable position, because she can no longer rely on the employer who is supposed to address the harassment. If supervisors permit the harassment of an employee, and the employer cannot or will not protect the employee from such harassment, the employee may have good cause to quit. As the majority points out, there is considerable authority that stands for this proposition. *See Hanke v. Safari Hair Adventure*, 512 N.W.2d 614, 618 (Minn.App.1994); *Wetterhahn v. Kimm Co.*, 430 N.W.2d 4, 6 (Minn. App.1988); *Curry v. Gatson*, 180 W.Va. 272, 376 S.E.2d 166, 169 (1988); *Tru–Stone Corp. v. Gutzkow*, 400 N.W.2d 836, 839 (Minn.App. 1987); *Turco v. Dep't of Employment Security*, 141 Vt. 135, 446 A.2d 345, 347 (1982).

The record contains some evidence that Esselman's employer took steps to relieve the workplace problems cited by Esselman. The majority finds it significant that Esselman's employer scheduled a retreat and brought in an outside group to provide employee assistance. I do not believe, however, that the majority opinion should be read to imply that employers can immunize themselves from the need to deal with workplace harassment by simply scheduling retreats and meetings recommended by outside consultants. What actually takes place at these meetings is very important. In the present case, Esselman testified she felt intimidated when one of her co-workers stood up, yelled at her, and moved toward her in an intimidating way. This occurred in the presence of a supervisor and nothing was done to stop or discourage the conduct. At the January 1995 meeting, Carol Butz, a supervisor, started by identifying three employees, including

---

**2.** The dissent cites *Heifetz v. Dep't of Business Regulation*, 475 So.2d 1277, 1281 (Fla.App. 1985), which is a Florida case that is contrary to our North Dakota law. *Schultz v. North Dakota Dep't of Human Services*, 372 N.W.2d 888, 892 (N.D.1985). While a hearing officer (referee) may in some cases be in the better position to observe witnesses and determine the basic evidentiary facts ("what happened"), the agency head (Executive Director) may be in the better position to determine the ultimate question, whether, as here, evidentiary facts amount to "good cause." *Compare, Thompson v. Keohane*, ⸺ U.S. ⸺, ⸺–⸺, 116 S.Ct. 457, 465–466, 133 L.Ed.2d 383 (1995). And as this Court has held, "an agency may reject the examiner's decision even on a question involving the credibility of contradictory witnesses." *Schultz*.

Esselman, as the problem. Esselman, Marilyn Carlson, and Brad Brown were identified as the ones who wrote a letter to Henry C. "Bud" Wessman. David Snyder, the director, told their coworkers the letter identified him as a poor director. He told the team that writing the letter was poor judgment. Butz admitted in testimony, "[t]here was no reason for others to know who wrote the letter." Esselman, Carlson, and Brown were called insubordinate by a coworker. Their supervisor and the director did nothing to discourage the name calling.

The agency reviewed the testimony and decided that Esselman quit her job without good cause attributable to the employer. I am bound by the standard of review contained in Section 28–32–19, N.D.C.C. In this case I cannot say that a reasoning mind could not have reasonably decided that the agency's factual conclusions were proven by the weight of the evidence. I, therefore, agree with the majority that the agency decision must be affirmed.

MESCHKE, Justice, dissenting.

I respectfully dissent. In my opinion, the Referee's findings, conclusions, and decisions in these cases are reasonable, while the contradictory findings and decisions by the Executive Director of Job Service, said to be "conducted on the basis of the information contained in the record," are unreasonable and unexplained.

A person is disqualified for unemployment compensation benefits if she has left her employment "voluntarily without good cause attributable to the employer." NDCC 52–06–02(1). In several situations, however, this specific disqualification "does not apply." *Id.* Two of those exceptions deal with illness or injury. *Id.* These claimants concede the

first exception for leaving employment "following illness or injury upon a physician's written notice or order" does not apply to them because they did not "notif[y] the employer of the physician's requirement and ... offer[ ] service for suitable work to the employer upon the individual's capability of returning to employment." NDCC 52–06–02(1) (second "does not apply" clause). Rather, claimants would seem to qualify for benefits under the third "does not apply" clause:

> This subsection does not apply if the individual left the most recent employment because of an injury or illness caused or aggravated by the employment; no benefits may be paid under this exception unless the individual leaves employment upon a physician's written notice or order, the individual has notified the employer of the physician's requirement, and there is no reasonable alternative but to leave employment.

In any event, under NDCC 52–06–36, there is the specific requirement that, "in determining the existence of good cause for [any claimant] voluntarily leaving [her] work under ... section 52–06–02[ (1) ], there must be considered among other factors ... the degree of risk involved to [her] health...." [1]

In these cases, Job Service does not contest Esselman's filed medical statement from her physician that he had advised her to quit her job "because of illness," identifying "SEVERE MUSCLE TENSION HEADACHES," nor does Job Service confront Carlson's filed medical statement from her physician that he had advised her to quit her job "because of illness," identifying "depression, stress related symptoms and insomnia."

---

1. Esselman argued in her appellate brief:
 [Job Service] on review did not consider all reasons which may have combined or separately, given Michelle good cause to quit her employment. [Job Service] incorrectly applied the medical quit exception and denied Michelle benefits. Michelle was not given a fair decision based on the facts and evidence of the case, nor was she given a decision based on the pertinent law at hand.
 The medical exception to N.D.Cent.Code § 52–06–02 (Supp.1995) does not apply here because Michelle voluntarily quit her employment with good cause attributable to the employer. Michelle was affected to the extent that it caused stress daily. App. 15. Stress-related headaches, stomach problems and sleeping problems became more frequent. App. 15. These health problems were directly related to the stress with her employment and are attributable to her employer and must be considered by [Job Service] as a reason for quitting.

The public policy of this state seeks to soften the harsh impact of involuntary unemployment. NDCC 52–01–05; *Newland v. Job Serv. North Dakota,* 460 N.W.2d 118, 121 (N.D.1990). As remedial statutes, the unemployment compensation statutes must be liberally construed to effectuate the public policies expressed in them. *Newland* at 122; 76 Am.Jur.2d *Unemployment Compensation* § 14 (1992). Uncorrected harassment by other employees that make working conditions intolerable creates good cause attributable to the employer. 76 Am.Jur.2d *Unemployment Compensation* § 105, p. 875; *Karloff v. Unemployment Compensation Bd. Of Review,* 109 Pa.Cmwlth. 498, 531 A.2d 582, 584 (1987) (Voluntary termination of employment "due to a personality conflict with another employee which renders working conditions intolerable will constitute cause of a necessitous and compelling nature for terminating employment.").

For Esselman, the Referee reasonably determined:

> The claimant quit her job after she became dissatisfied with the conditions of her employment. The claimant was often made to feel as though she was part of a faction within the unit to be avoided. She was treated with indifference, threatened by a co-worker, and, in general, treated as a problem maker by the co-workers and management. The claimant's supervisor was aware of the stressful conditions that involved the claimant, co-workers, and management through her own observations and numerous discussions with the claimant.
>
> The claimant eventually sought relief by discussing her concerns with the agency director. She requested a meeting with the director and her supervisors in order to resolve the conflict. The employer denied this request. When the conditions of employment did not improve, the claimant addressed her concerns to the agency head, in accordance with what she believed was company policy. The claimant was never made aware of any other grievance procedure.
>
> In October 1994, a counselor from the employee assistance program was called in to address the conflict among the claimant, co-workers, and management. During this same period, the claimant was put on medication for symptoms of work-related depression and was advised to quit her employment. The claimant, however, chose to continue working in the hope that conditions would improve.
>
> The final incident occurred on January 11, 1995, during a staff meeting designed to resolve the conflicts present in the workplace. During this meeting, the program director revealed the names of the individuals who had addressed their concerns to the agency head; namely, the claimant and two co-workers. The claimant was humiliated over the breach of confidentiality by the program director. During this meeting, the employer also allowed co-workers to engage in name calling toward the claimant for addressing her concerns to the agency head. The claimant realized that her employment conditions would not change and believed she had no choice but to resign. The claimant submitted her resignation on January 17, 1995.
>
> . . . .
>
> In this case, however, the record shows specific action on the part of the employer by words and actions that left the claimant with no other alternative but to leave her employment. The claimant has established that the conditions of her employment had become significantly unfavorable to the extent that she could no longer continue working. Therefore, it must be concluded that the claimant left her employment with good cause attributable to the employer. Accordingly, the claimant is entitled to job insurance benefits.

For Carlson, the Referee similarly determined reasonably:

> The claimant quit her job after she became dissatisfied with the conditions of her employment. The claimant cited indifference on the part of her co-workers and supervisor, on-the-spot changes in duties, and exclusion from tasks she once was part of as reasons for leaving. The claimant's supervisor was aware of the stressful conditions that involved the claimant, co-workers, and management through her own observations

and numerous discussions with the claimant.

As conditions of employment worsened, the claimant and two co-workers sought relief by discussing their concerns with the director of the agency for which the claimant worked. The claimant requested that she be allowed to meet with her supervisor and the director. The director denied the claimant's request under the premise that if the claimant's concerns involved her co-workers, then the co-workers should also be included in the meeting. As a result, the claimant was not given the opportunity to meet with her supervisor as requested.

The conditions of employment worsened to the extent that in October 1994, a counselor from the Employee Assistance Program was called in by the employer to resolve the conflict among the claimant, co-workers, and management. During this same period, the claimant and two co-workers addressed their concerns to the head of the agency in accordance with what she believed was company policy. According to the claimant's testimony, no relief was provided. The claimant was put on medication for symptoms of depression related to her work environment and advised by her physician to quit her employment. The claimant chose, however, to continue working for financial reasons and in the hope that conditions would improve.

The final incident occurred on January 11, 1995, during a staff meeting designed to resolve the conflicts present in the workplace. During this meeting, the program director revealed the names of the individuals who had addressed their concerns to the agency head; namely, the claimant and the two co-workers. As a result, the claimant was taunted with name calling by co-workers for taking her concerns to the agency head. The claimant realized that her employment conditions would not change and believed that she had no choice but to resign after the breach of confidentiality by the program director. She therefore, submitted her resignation on January 17, 1995.

. . . .

According to testimony taken at the hearing, the claimant has established that the conditions of her employment had become significantly unfavorable to the extent that she could no longer continue working. Therefore, it must be concluded that the claimant has established good cause for leaving. Accordingly, the claimant is entitled to job insurance benefits.

In my opinion, the findings and decisions by the Executive Director did not satisfactorily explain the reasons for deviating from the Referee's findings, and unreasonably sought to shift the blame for the unfavorable employment conditions away from the Referee's findings of supervisory indifference: "When the conditions of employment did not improve, . . ."; "the conditions of her employment had become significantly unfavorable to the extent that she could no longer continue working." The Executive Director's decisions virtually ignored the adverse effects on the health of these claimants.

As the majority in *Carlson* recognizes, we sometimes permit an agency head to replace a hearing officer's findings and recommendations because "[w]e do not believe it is appropriate to probe [his] mental process in arriving at his decision." *Schultz v. North Dakota Dep't of Human Servs.*, 372 N.W.2d 888, 892 (N.D.1985). However, we have specifically limited this deference: "The findings, conclusions, and decision should be sufficient to explain the rationale for not following the hearing officer's recommendation." *Id.*

The need for a satisfactory explanation from the agency head when different findings and a different decision have been made has often been stressed, but we have rarely identified a case that needed more explanation. *See Medcenter One, Inc. v. Job Serv. North Dakota,* 410 N.W.2d 521, 524 (N.D.1987) ("[W]here the agency has rejected a hearing officer's decision, a necessary part of our inquiry is whether the agency's decision satisfactorily explains the reason for not following the hearing officer's recommendation."); *Redwood Village Partnership, Ltd. v. North Dakota Dep't of Human Servs.*, 420 N.W.2d 333, 335–36 (N.D.1988) (same); *Matter of Stone Creek Channel Improvements,* 424

N.W.2d 894, 902 (N.D.1988) (same); *Speedway, Inc. v. Job Serv. North Dakota,* 454 N.W.2d 526, 527 (N.D.1990) (same); *McCarter v. Pomeroy,* 466 N.W.2d 562, 567 (N.D. 1991) (same); *Marion v. Job Serv. North Dakota,* 470 N.W.2d 609, 613 (N.D.1991) (same); *Hins v. Lucas Western,* 484 N.W.2d 491, 494 (N.D.1992) (same); *Kackman v. North Dakota Workers' Compensation Bureau,* 488 N.W.2d 623, 625 (N.D.1992) (same). *See also Speedway,* 454 N.W.2d at 530–31 (Pederson, S.J., dissenting) ("Although it might appear ... that in this state judicial deference is absolute, we have not always followed that practice."); *Allstate Ins. Co. v. Knutson,* 278 N.W.2d 383 (N.D.1979); *Hammond v. North Dakota State Personnel Bd.,* 345 N.W.2d 359, 365 (N.D.1984) (Pederson, J., concurring and dissenting) ("[W]hen the board is rejecting the hearing officer's recommended decision, they must explain the grounds therefor.").

Some other states accord much more credence to the hearing officer's findings than our current formulation does. *See Heifetz v. Department of Business Regulation,* 475 So.2d 1277, 1281 (Fla.App.1985) ("The agency may not reject the hearing officer's finding unless there is no competent, substantial evidence from which the finding could reasonably be inferred. The agency is not authorized to weigh the evidence presented, judge credibility of witnesses, or otherwise interpret the evidence to fit its desired ultimate conclusion."); *Brown v. Criminal Justice Standards & Training Comm'n,* 667 So.2d 977 (Fla.App.1996) (commission improperly reweighed evidence). At least, as explained in 2 Am.Jur.2d *Administrative Law* § 374 (1994): "An agency must fully and particularly set out the facts and reasons for its departure from an initial decision" by a hearing officer.

If we mean what we say, we should insist on explanation in these companion cases. The Executive Director should not have unbridled discretion to fabricate his own findings and reach an unreasoned decision. *See National Sun Industries v. Ransom County,* 474 N.W.2d 502 (N.D.1991) (without substantial evidence, board's determination of value was arbitrary and unreasonable). In these cases, so far as I can see, the Executive Director did not really try to explain his divergent decisions.

One significant illustration should suffice. The Executive Director added this finding in Esselman's case:

> The employer did have a grievance procedure in place which could have been utilized by the claimant. However, instead of utilizing the grievance procedure, the claimant and the other two co-workers wrote a letter directly to the director of the agency with a copy to the Governor.

But the referenced grievance procedure was neither described in, nor made part of, the Esselman record. Carlson testified at Esselman's hearing that she had checked for one and believed they had followed it by going in turn to the three supervisory levels in their Center, and then writing to the head of their agency. Esselman believed their joint letter to the head of their agency "was the next step," and the Referee specifically found that she "was never made aware of any other grievance procedure." We do not know the specific procedure the Executive Director felt Carlson and Esselman should have followed. The Executive Director's fabricated finding is unsupported.

Similarly, in Carlson's case, the Referee found that, eventually, "the claimant and two co-workers addressed their concerns to the head of the agency in accordance with what she believed was company policy," but "no relief was provided," and "claimant was put on medication for symptoms of depression related to her work environment and advised by her physician to quit her employment." The Executive Director ignored those findings and, instead, similarly decided that the claimant failed to use a grievance procedure, but without an adequate record to demonstrate what it was that Carlson was supposed to have done. *See Johnides v. St. Lawrence Hosp.,* 184 Mich.App. 172, 457 N.W.2d 123, 126 (1990) (claimant's failure to use grievance procedure not "dispositive on the issue of good cause").

In my opinion, the findings of fact made by the agency in these two cases are not reasonably supported by the evidence, NDCC 28–32–19(5), the substituted findings and conclu-

410

sions did not afford Carlson and Esselman fair hearings, *id.* at (4), and the agency orders denying benefits are not in accordance with the law. *Id.* at (1). Therefore, I would reverse Job Service's denial of benefits in each case, and thus reverse the district court in *Esselman* and affirm the district court in *Carlson.* I respectfully dissent in both cases.