Marilyn CARLSON, Claimant and Appellee,

v.

JOB SERVICE NORTH DAKOTA, Respondent,

and

North Dakota Department of Human Services, Respondent and Appellant.

Marilyn CARLSON, Claimant and Appellee,

v.

JOB SERVICE NORTH DAKOTA, Respondent and Appellant,

and

North Dakota Department of Human Services, Respondent.

Civil Nos. 950409, 950415.

Supreme Court of North Dakota.

May 29, 1996.

Richard L. Hagar, Kenner Sturdevant Peterson Cresap, P.C., Minot, for claimant and appellee.

Douglas A. Bahr, Assistant Attorney General, Attorney General's Office, Bismarck, for respondent and appellant Job Service North Dakota.

Tag C. Anderson, Assistant Attorney General, Attorney General's Office, Bismarck, for respondent and appellant North Dakota Department of Human Services.

VANDE WALLE, Chief Justice.

Job Service North Dakota (Job Service) and the North Dakota Department of Human Services (the Department) appealed from a district court judgment reversing Job Service's denial of Marilyn Carlson's claim for unemployment benefits. We conclude a preponderance of evidence supports Job Service's finding Carlson voluntarily quit her job without good cause attributable to her employer, and we reverse the district court judgment.

For more than ten years Carlson was employed by the North Central Human Service Center (North Central), which is the Minot District Office of the Department of Human Services, as a licensed addiction counselor. Together with two other coworkers, Marilyn resigned effective January 31, 1995, and she applied for unemployment benefits, claiming she quit her job "due to the stress ... through several matters of being degraded and treated unprofessionally, it started taking a toll on my life." A claims analyst denied Carlson's request for benefits, and she requested an administrative review.

After a hearing, an administrative referee found "the claimant has established that the conditions of her employment had become significantly unfavorable to the extent that she could no longer continue working" and concluded Carlson quit her job for good cause attributable to her employer, thereby entitling her to receive unemployment benefits. North Central requested a review by the Executive Director of Job Service, who rejected the referee's decision and concluded Carlson was not entitled to unemployment benefits because she voluntarily quit her job without good cause attributable to her employer. Carlson appealed to the district court, which overruled the Executive Director's decision in a terse memorandum decision, simply stating the agency's findings of fact were not supported by a preponderance of the evidence and its conclusions were not

supported by its findings of fact. This appeal followed.

■ The standard for reviewing an appeal from an administrative agency decision is set forth under Section 28–32–19, N.D.C.C. We review the decision of the agency, not the decision of the district court. *Lambott v. Job Service North Dakota*, 498 N.W.2d 157 (N.D. 1993). We sustain the agency's findings of fact unless they are not supported by a preponderance of the evidence and uphold the agency's conclusions of law unless they are not supported by its findings of fact. *Lovgren v. Job Service North Dakota*, 515 N.W.2d 143 (N.D.1994). We do not make independent findings of fact or substitute our judgment for that of the agency, but decide only whether a reasoning mind could have reasonably decided the agency's factual conclusions were proved by the weight of the evidence. *Tehven v. Job Service North Dakota*, 488 N.W.2d 48 (N.D.1992).

■ Unemployment compensation is available to a worker who is unemployed through no fault of her own. Chapter 52–06, N.D.C.C.; *Newland v. Job Service North Dakota*, 460 N.W.2d 118 (N.D.1990). However, under Section 52–06–02, N.D.C.C., a worker is disqualified from receiving benefits if she voluntarily quits employment without good cause attributable to her employer, and the employee has the burden of proving she quit her job for good cause. *Erovick v. Job Service North Dakota*, 409 N.W.2d 629 (N.D.1987). The question whether a claimant quit without good cause is a "factual conclusion." *Lipp v. Job Service North Dakota*, 468 N.W.2d 133, 134 (N.D.1991).

We have decided today a companion case, *Esselman v. Job Service North Dakota*, 548 N.W.2d 400 (N.D.1996), involving Carlson's coworker, Michelle Esselman, who resigned on the same day Carlson resigned, for similar reasons under nearly identical circumstances. The relevant law and pertinent facts in each opinion are necessarily very similar, with one noted exception. In *Esselman* the district court upheld Job Service's denial of benefits to Esselman whereas the district court, a different judge sitting, reversed Job Service's denial of benefits to Carlson. Although we review the decision of the admin-

istrative agency, not that of the district court, in our deliberations we consider the district court's analysis and reasoning. *Ekstrom v. North Dakota Workers Compensation Bureau*, 478 N.W.2d 380 (N.D.1991). In this case the district court has not given more than a glimpse of its analysis. The court in four sentences of boiler plate simply said the referee's decision is correct and the agency's findings are not supported by a preponderance of evidence nor its conclusions supported by its findings. The district court may have believed the referee's findings must be followed.

■ Carlson complains the Executive Director of Job Service, in denying her claim for benefits, "failed to point out why [the referee's] findings were in error." We disagree. In *Schultz v. North Dakota Dep't of Human Services*, 372 N.W.2d 888, 892 (N.D. 1985), we stated:

> "Although a hearing examiner has the advantage of hearing and seeing witnesses testify, an agency may reject the examiner's decision even on a question involving the credibility of contradictory witnesses.
>
> * * *
>
> "Our inquiry is limited to a review of the findings, conclusions, and decision of the agency under the appropriate standard of review. The findings, conclusions, and decision should be sufficient to explain the rationale for not following the hearing officer's recommendation." (Citations omitted.)

Here, the Executive Director expressly stated his review was conducted "on the basis of the information contained in the record." We quote at length his relevant findings and reasoning, which clearly show why he rejected the referee's conclusion that Carlson is entitled to unemployment benefits:

> "The claimant resigned her position because she was dissatisfied with working conditions. There was some disharmony among staff in the unit where the claimant worked which developed early in 1994.... The claimant felt that the new supervisor gave her a negative performance evaluation in comparison to the nine previous

performance evaluations she had received. However, the new supervisor did not believe that the claimant's performance evaluation was negative. . . .

"During the summer of 1994, a new position for a women's program opened up. The claimant was considered as a leading candidate for the position by management. The claimant was not selected for the position because the position would have involved working with the new coworker hired in February and the claimant told management that it would be very difficult for her to work with someone who disliked her so much. . . .

"In October 1994, the job duties of the claimant and other employees in her unit were changed. These changes were necessitated by new licensure mandates and all staff in the unit were expected to accept the changes.

\* \* \*

"The director of the center where the claimant worked arranged for assistance from an employee assistance program in an attempt to resolve the problems within the unit. On November 2, 1994, a meeting was held with the representative from the employee assistance program and staff from the unit, including the claimant. Fifteen areas of concern were identified and a plan was established to address one area of concern per month.

\* \* \*

". . . The claimant continued working until January 31, 1995. At no time did she advise her employer that a physician advised her to quit her employment. The claimant's written resignation did not set forth any reasons why she was quitting her employment.

". . . . [W]hile the claimant was dissatisfied with working conditions, evidence in the record does not establish that the conditions were of a nature or extent as to be considered good cause attributable to the employer for voluntarily leaving employment. The employer made a good faith attempt to resolve the situation by arranging a retreat and for employee assistance . . . Under these circumstances, the claim-

ant has not established good cause attributable to the employer for voluntarily leaving employment."

The Executive Director's findings are supported by the testimony and other evidence in the record. Clearly, the Executive Director made his decision only after careful review and consideration of the record. We therefore conclude Carlson was not denied her right to a considered decision by the agency. *C.f. Hammond v. North Dakota State Personnel Board*, 345 N.W.2d 359 (N.D.1984)[State Personnel Board's decision on employee's termination based solely upon review of hearing examiner's report and recommendation rather than a review of the record evidence denied employee a fair hearing].

 Carlson contends she was forced to quit her job because she was unable to get along with some of her coworkers and felt stressed and harassed at work. There is considerable authority that an employee has good cause to quit her job if she is being harassed by coworkers and her employer, with knowledge of the harassment, ignores it and fails to take measures to stop it. *Hanke v. Safari Hair Adventure*, 512 N.W.2d 614 (Minn.Ct.App.1994); *Wetterhahn v. Kimm Co.*, 430 N.W.2d 4 (Minn.Ct.App.1988); *Curry v. Gatson*, 180 W.Va. 272, 376 S.E.2d 166 (1988); *Tru–Stone Corp. v. Gutzkow*, 400 N.W.2d 836 (Minn.Ct.App.1987); *Turco v. Dep't of Employment Security*, 141 Vt. 135, 446 A.2d 345 (1982); and *Richards v. Daniels*, 1 Ark.App. 331, 615 S.W.2d 399 (1981). It is equally clear, however, an employee does not have good cause to quit her job merely because she has irreconcilable differences with coworkers or is frustrated or dissatisfied with her working conditions. *See, e.g., Portz v. Pipestone Skelgas*, 397 N.W.2d 12 (Minn.Ct.App.1986).

Carlson relies in particular on the *Richards* case to support her claim she quit for good cause attributable to North Central. In *Richards*, a kindergarten teacher was harassed by a principal and other teachers when she refused to sign a petition against the school's superintendent. After she refused to sign the petition, the principal and teachers failed to notify her of meetings,

failed to give her messages, and refused to assist her when she had problems with students. The principal scheduled Richards' rest break at the end of the school day and then sent "one-sided, bad reports" about her to the superintendent. For three years Richards asked to be transferred to another grade within the school system, but her requests were refused on the ground she was best qualified to teach kindergarten. Richards finally resigned and was denied unemployment benefits because she had voluntarily quit. The Arkansas Court of Appeals held Richards' resignation was for good cause attributable to her employer. The court found Richards was mistreated by coworkers for a considerable period of time and that she had made reasonable, but unsuccessful, efforts to resolve the conflict by requesting a transfer within the school system. The court concluded a reasonable person in Richards' circumstances would have been compelled to quit.

*Richards* is clearly distinguishable from the circumstances here. Carlson was not subjected to the same type of harassment as Richards experienced. There is evidence Carlson was as much or more the cause of the office conflict and disharmony as any other employee. Furthermore, unlike Richards' employer, who refused Richards' suggested transfer and failed to seek any other solution to the ongoing harassment Richards was experiencing, North Central intervened to resolve the office problems.

Carlson claims her employer was "unwilling to take responsibility for the wellbeing of [her] as an employee" and that her supervisor "did not make every reasonable effort to resolve the split faction in the unit." The Executive Director found North Central did take responsibility for its employees' wellbeing and did attempt to resolve the conflict and disharmony in the office by holding an employee retreat and then getting help from the St. Alexius employee assistance program. As part of that program, North Central agreed to have the employees meet on a monthly basis to discuss and attempt to resolve their problems. It was at these meetings where some of Carlson's coworkers bluntly expressed their views that Carlson was at least partially responsible for the office tension and conflict. One employee openly accused Carlson and two others of being insubordinate for sending a letter of complaint to the Director of the Department of Human Services.

Carlson felt unprofessionally treated and harassed by some of the comments made at the group meetings. However, the comments which made Carlson feel harassed and treated unprofessionally by her coworkers were made in very limited instances during group meetings held for the specific purpose of inviting candid discussion to determine why the employees were having problems and to resolve the conflict. This is certainly an acceptable management practice and one that was recommended to North Central by persons operating the employee assistance program. As a matter of public policy employees cannot be allowed to force an employer to choose between disharmonious factions and then hold the employer responsible if one group decides to leave the workplace.

Rather than ignore the conflict among the employees, North Central took measures to resolve the conflict. Thus, this is not a case where an employer has watched with callous disregard or indifference while employees discriminated, taunted, or harassed a coworker. Fairly summarized, Carlson's complaint is that some employees did not get along or feel comfortable working with each other. North Central detected the conflict and attempted in good faith to rectify the problem. The monthly meetings were scheduled to restore harmony and efficiency in the workplace. North Central's director described the January 11, 1995 meeting as "a very stressful couple of hours and it was quite evident to everybody that we were going nowhere," and he decided he would "no longer follow this process." However, he did not testify that he had abandoned all hope or efforts to resolve the conflict or that he had decided to terminate any employees. Unfortunately, Carlson submitted her letter of resignation a few days after the January meeting and thereby short-circuited any further measures to resolve the problem.

Having reviewed the record, we believe there is substantial evidence to support the Executive Director's conclusion that North

Central made a good-faith effort to resolve the conflict among its employees. We conclude a reasoning mind could have reasonably determined, as did Job Service in this case, that Carlson failed to prove her resignation was the result of good cause attributable to her employer.

▮▮▮ Carlson also claims she was denied a fair hearing because Job Service considered an ex parte communication by the office director. In requesting a review of the referee's recommendation, the director submitted a memorandum explaining his position on the issues. Carlson was provided a copy of the memorandum and had ample opportunity to respond to it. Although Carlson claims the Executive Director of Job Service "relied on portions of this memo to reverse the referee's decision," we are not convinced he relied upon any substantive fact contained in the memorandum which was not also a part of the record evidence. A person is denied due process or a fair hearing when the defects in the hearing process might lead to a denial of justice. *Erovick v. Job Service North Dakota,* 409 N.W.2d 629 (N.D.1987). We are unpersuaded Carlson was denied justice in this hearing process. We conclude the agency did not impermissibly rely upon the memorandum and did not deny Carlson a fair hearing.

▮▮▮ The dissent discusses at length the medical history of the claimants while recognizing the "claimants concede the first exception for leaving employment 'following illness or injury upon a physician's written notice or order' does not apply to them because they did not 'notif[y] the employer of the physician's requirement and . . . offer[ ] service for suitable work to the employer upon the individual's capability of returning to employment.'" The claimants freely admitted they were not relying on the "medical quit." But the dissent uses the medical condition to justify compensation under the "good cause attributable to the employer" provision.

It may be contrary to public policy to permit the claimant to rely on the medical statement to justify leaving employment under the "good cause attributable to the employer" provision without having complied with the statute which governs that exact

situation. More significantly for our purposes, however, the dissent ignores the fact that the stress, tension and depression were due not to the actions of the employer but the claimants' inability or refusal to work with other employees of the Department.

In urging that the findings of the referee control, the dissent cites the Florida decision of *Heifetz v. Department of Business Regulation,* 475 So.2d 1277, 1281 (Fla.App.1985) for the proposition that the "agency is not authorized to weigh the evidence presented, judge credibility of witnesses, or otherwise interpret the evidence to fit its desired ultimate conclusion." As this court stated in *Schultz v. North Dakota Dept. of Human Services,* 372 N.W.2d 888, 892 (N.D.1985):

"The administrative officer deciding a case need not actually hear the witnesses testify or hear oral argument, but the officer deciding the case must consider and appraise the evidence before reaching a decision. *Morgan v. United States,* 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936); 3 Davis, Administrative Law, § 17:2 (2d Ed.1980). Although a hearing examiner has the advantage of hearing and seeing witnesses testify, an agency may reject the examiner's decision even on a question involving the credibility of contradictory witnesses. 3 Davis, Administrative Law, § 17:16. A court's review of an agency decision does not include probing an agency decisionmaker's mental process if a hearing was given as required by law. *Morgan v. United States,* 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938); 3 Davis, Administrative Law, § 17:16; Annot., 18 A.L.R.2d 606, 623 (1951)."

Here, the agency head leaves little doubt but that the reason for leaving employment was not due to the Department but to the claimants and that the Department's "failing" was its refusal to permit the claimants to manage the operation.

In accordance with this opinion, the judgment of the district court reversing Job Service's denial of Carlson's claim for unemployment benefits is reversed.

SANDSTROM and NEUMANN, JJ., concur.

MESCHKE, Justice, dissenting.

I respectfully dissent. In my opinion, the Referee's findings, conclusions, and decisions in these cases are reasonable, while the contradictory findings and decisions by the Executive Director of Job Service, said to be "conducted on the basis of the information contained in the record," are unreasonable and unexplained.

A person is disqualified for unemployment compensation benefits if she has left her employment "voluntarily without good cause attributable to the employer." NDCC 52–06–02(1). In several situations, however, this specific disqualification "does not apply." *Id.* Two of those exceptions deal with illness or injury. *Id.* These claimants concede the first exception for leaving employment "following illness or injury upon a physician's written notice or order" does not apply to them because they did not "notif[y] the employer of the physician's requirement and ... offer[ ] service for suitable work to the employer upon the individual's capability of returning to employment." NDCC 52–06–02(1) (second "does not apply" clause). Rather, claimants would seem to qualify for benefits under the third "does not apply" clause:

> This subsection does not apply if the individual left the most recent employment because of an injury or illness caused or aggravated by the employment; no benefits may be paid under this exception unless the individual leaves employment upon a physician's written notice or order, the individual has notified the employer of the physician's requirement, and there is no reasonable alternative but to leave employment.

In any event, under NDCC 52–06–36, there is the specific requirement that, "in deter-

mining the existence of good cause for [any claimant] voluntarily leaving [her] work under ... section 52–06–02[ (1) ], there must be considered among other factors ... the degree of risk involved to [her] health...."[1]

In these cases, Job Service does not contest Esselman's filed medical statement from her physician that he had advised her to quit her job "because of illness," identifying "SEVERE MUSCLE TENSION HEADACHES," nor does Job Service confront Carlson's filed medical statement from her physician that he had advised her to quit her job "because of illness," identifying "depression, stress related symptoms and insomnia."

The public policy of this state seeks to soften the harsh impact of involuntary unemployment. NDCC 52–01–05; *Newland v. Job Serv. North Dakota*, 460 N.W.2d 118, 121 (N.D.1990). As remedial statutes, the unemployment compensation statutes must be liberally construed to effectuate the public policies expressed in them. *Newland* at 122, 460 N.W.2d 118; 76 Am.Jur.2d *Unemployment Compensation* § 14 (1992). Uncorrected harassment by other employees that make working conditions intolerable creates good cause attributable to the employer. 76 Am. Jur.2d *Unemployment Compensation* § 105, p. 875; *Karloff v. Unemployment Compensation Bd. of Review*, 109 Pa.Cmwlth. 498, 531 A.2d 582, 584 (1987) (Voluntary termination of employment "due to a personality conflict with another employee which renders working conditions intolerable will constitute cause of a necessitous and compelling nature for terminating employment.").

For Esselman, the Referee reasonably determined:

> The claimant quit her job after she became dissatisfied with the conditions of her em-

1. Esselman argued in her appellate brief:
 [Job Service] on review did not consider all reasons which may have combined or separately, given Michelle good cause to quit her employment. [Job Service] incorrectly applied the medical quit exception and denied Michelle benefits. Michelle was not given a fair decision based on the facts and evidence of the case, nor was she given a decision based on the pertinent law at hand.
 The medical exception to N.D.Cent.Code § 52–06–02 (Supp.1995) does not apply here be-

> cause Michelle voluntarily quit her employment with good cause attributable to the employer. Michelle was affected to the extent that it caused stress daily. App. 15. Stress-related headaches, stomach problems and sleeping problems became more frequent. App. 15. These health problems were directly related to the stress with her employment and are attributable to her employer and must be considered by [Job Service] as a reason for quitting.

ployment. The claimant was often made to feel as though she was part of a faction within the unit to be avoided. She was treated with indifference, threatened by a co-worker, and, in general, treated as a problem maker by the co-workers and management. The claimant's supervisor was aware of the stressful conditions that involved the claimant, co-workers, and management through her own observations and numerous discussions with the claimant.

The claimant eventually sought relief by discussing her concerns with the agency director. She requested a meeting with the director and her supervisors in order to resolve the conflict. The employer denied this request. When the conditions of employment did not improve, the claimant addressed her concerns to the agency head, in accordance with what she believed was company policy. The claimant was never made aware of any other grievance procedure.

In October 1994, a counselor from the employee assistance program was called in to address the conflict among the claimant, co-workers, and management. During this same period, the claimant was put on medication for symptoms of work-related depression and was advised to quit her employment. The claimant, however, chose to continue working in the hope that conditions would improve.

The final incident occurred on January 11, 1995, during a staff meeting designed to resolve the conflicts present in the workplace. During this meeting, the program director revealed the names of the individuals who had addressed their concerns to the agency head; namely, the claimant and two co-workers. The claimant was humiliated over the breach of confidentiality by the program director. During this meeting, the employer also allowed co-workers to engage in name calling toward the claimant for addressing her concerns to the agency head. The claimant realized that her employment conditions would not change and believed she had no choice but to resign. The claimant submitted her resignation on January 17, 1995.

. . . .

In this case, however, the record shows specific action on the part of the employer by words and actions that left the claimant with no other alternative but to leave her employment. The claimant has established that the conditions of her employment had become significantly unfavorable to the extent that she could no longer continue working. Therefore, it must be concluded that the claimant left her employment with good cause attributable to the employer. Accordingly, the claimant is entitled to job insurance benefits.

For Carlson, the Referee similarly determined reasonably:

The claimant quit her job after she became dissatisfied with the conditions of her employment. The claimant cited indifference on the part of her co-workers and supervisor, on-the-spot changes in duties, and exclusion from tasks she once was part of as reasons for leaving. The claimant's supervisor was aware of the stressful conditions that involved the claimant, co-workers, and management through her own observations and numerous discussions with the claimant.

As conditions of employment worsened, the claimant and two co-workers sought relief by discussing their concerns with the director of the agency for which the claimant worked. The claimant requested that she be allowed to meet with her supervisor and the director. The director denied the claimant's request under the premise that if the claimant's concerns involved her co-workers, then the co-workers should also be included in the meeting. As a result, the claimant was not given the opportunity to meet with her supervisor as requested. The conditions of employment worsened to the extent that in October 1994, a counselor from the Employee Assistance Program was called in by the employer to resolve the conflict among the claimant, co-workers, and management. During this same period, the claimant and two co-workers addressed their concerns to the head of the agency in accordance with what she believed was company policy. According to the claimant's testimony, no relief was pro-

vided. The claimant was put on medication for symptoms of depression related to her work environment and advised by her physician to quit her employment. The claimant chose, however, to continue working for financial reasons and in the hope that conditions would improve.

The final incident occurred on January 11, 1995, during a staff meeting designed to resolve the conflicts present in the workplace. During this meeting, the program director revealed the names of the individuals who had addressed their concerns to the agency head; namely, the claimant and the two-co-workers. As a result, the claimant was taunted with name calling by co-workers for taking her concerns to the agency head. The claimant realized that her employment conditions would not change and believed that she had no choice but to resign after the breach of confidentiality by the program director. She therefore, submitted her resignation on January 17, 1995.

. . . .

According to testimony taken at the hearing, the claimant has established that the conditions of her employment had become significantly unfavorable to the extent that she could no longer continue working. Therefore, it must be concluded that the claimant has established good cause for leaving. Accordingly, the claimant is entitled to job insurance benefits.

In my opinion, the findings and decisions by the Executive Director did not satisfactorily explain the reasons for deviating from the Referee's findings, and unreasonably sought to shift the blame for the unfavorable employment conditions away from the Referee's findings of supervisory indifference: "When the conditions of employment did not improve, . . ."; "the conditions of her employment had become significantly unfavorable to the extent that she could no longer continue working." The Executive Director's decisions virtually ignored the adverse effects on the health of these claimants.

As the majority in *Carlson* recognizes, we sometimes permit an agency head to replace a hearing officer's findings and recommendations because "[w]e do not believe it is appropriate to probe [his] mental process in arriving at his decision." *Schultz v. North Dakota Dep't of Human Servs.*, 372 N.W.2d 888, 892 (N.D.1985). However, we have specifically limited this deference: "The findings, conclusions, and decision should be sufficient to explain the rationale for not following the hearing officer's recommendation." *Id.*

The need for a satisfactory explanation from the agency head when different findings and a different decision have been made has often been stressed, but we have rarely identified a case that needed more explanation. *See Medcenter One, Inc. v. Job Serv. North Dakota*, 410 N.W.2d 521, 524 (N.D.1987) ("[W]here the agency has rejected a hearing officer's decision, a necessary part of our inquiry is whether the agency's decision satisfactorily explains the reason for not following the hearing officer's recommendation."); *Redwood Village Partnership, Ltd. v. North Dakota Dep't of Human Servs.*, 420 N.W.2d 333, 335–36 (N.D.1988) (same); *Matter of Stone Creek Channel Improvements*, 424 N.W.2d 894, 902 (N.D.1988) (same); *Speedway, Inc. v. Job Serv. North Dakota*, 454 N.W.2d 526, 527 (N.D.1990) (same); *McCarter v. Pomeroy*, 466 N.W.2d 562, 567 (N.D. 1991) (same); *Marion v. Job Serv. North Dakota*, 470 N.W.2d 609, 613 (N.D.1991) (same); *Hins v. Lucas Western*, 484 N.W.2d 491, 494 (N.D.1992) (same); *Kackman v. North Dakota Workers' Compensation Bureau*, 488 N.W.2d 623, 625 (N.D.1992) (same). *See also Speedway*, 454 N.W.2d at 530–31 (Pederson, S.J., dissenting) ("Although it might appear . . . that in this state judicial deference is absolute, we have not always followed that practice."); *Allstate Ins. Co. v. Knutson*, 278 N.W.2d 383 (N.D.1979); *Hammond v. North Dakota State Personnel Bd.*, 345 N.W.2d 359, 365 (N.D.1984) (Pederson, J., concurring and dissenting) ("[W]hen the board is rejecting the hearing officer's recommended decision, they must explain the grounds therefor.").

Some other states accord much more credence to the hearing officer's findings than our current formulation does. *See Heifetz v. Department of Business Regulation*, 475 So.2d 1277, 1281 (Fla.App.1985) ("The agency

may not reject the hearing officer's finding unless there is no competent, substantial evidence from which the finding could reasonably be inferred. The agency is not authorized to weigh the evidence presented, judge credibility of witnesses, or otherwise interpret the evidence to fit its desired ultimate conclusion."); *Brown v. Criminal Justice Standards & Training Comm'n*, 667 So.2d 977 (Fla.App.1996) (commission improperly reweighed evidence). At least, as explained in 2 Am.Jur.2d *Administrative Law* § 374 (1994): "An agency must fully and particularly set out the facts and reasons for its departure from an initial decision" by a hearing officer.

If we mean what we say, we should insist on explanation in these companion cases. The Executive Director should not have unbridled discretion to fabricate his own findings and reach an unreasoned decision. *See National Sun Industries v. Ransom County*, 474 N.W.2d 502 (N.D.1991) (without substantial evidence, board's determination of value was arbitrary and unreasonable). In these cases, so far as I can see, the Executive Director did not really try to explain his divergent decisions.

One significant illustration should suffice. The Executive Director added this finding in Esselman's case:

> The employer did have a grievance procedure in place which could have been utilized by the claimant. However, instead of utilizing the grievance procedure, the claimant and the other two co-workers wrote a letter directly to the director of the agency with a copy to the Governor.

But the referenced grievance procedure was neither described in, nor made part of, the Esselman record. Carlson testified at Esselman's hearing that she had checked for one and believed they had followed it by going in turn to the three supervisory levels in their Center, and then writing to the head of their agency. Esselman believed their joint letter to the head of their agency "was the next step," and the Referee specifically found that she "was never made aware of any other grievance procedure." We do not know the specific procedure the Executive Director felt Carlson and Esselman should have followed.

The Executive Director's fabricated finding is unsupported.

Similarly, in Carlson's case, the Referee found that, eventually, "the claimant and two co-workers addressed their concerns to the head of the agency in accordance with what she believed was company policy," but "no relief was provided," and "claimant was put on medication for symptoms of depression related to her work environment and advised by her physician to quit her employment." The Executive Director ignored those findings and, instead, similarly decided that the claimant failed to use a grievance procedure, but without an adequate record to demonstrate what it was that Carlson was supposed to have done. *See Johnides v. St. Lawrence Hosp.*, 184 Mich.App. 172, 457 N.W.2d 123, 126 (1990) (claimant's failure to use grievance procedure not "dispositive on the issue of good cause").

In my opinion, the findings of fact made by the agency in these two cases are not reasonably supported by the evidence, NDCC 28–32–19(5), the substituted findings and conclusions did not afford Carlson and Esselman fair hearings, *id.* at (4), and the agency orders denying benefits are not in accordance with the law. *Id.* at (1). Therefore, I would reverse Job Service's denial of benefits in each case, and thus reverse the district court in *Esselman* and affirm the district court in *Carlson*. I respectfully dissent in both cases.

MARING, Justice, concurring in the result.

I write separately to again point out, in adherence with my concurrence in *Esselman v. Job Service*, 548 N.W.2d 400 (N.D.1996), that an employee may have good cause to quit when an employer, who is present during harassing and intimidating behavior directed by one employee at another co-employee, does nothing to stop or discourage such harassment. Merely setting up retreats and meetings without regard to how those meetings are conducted does not satisfy the responsibility of the employer to stop harassment of which it has notice.

I am bound by the standard of review set forth in section 28–32–19, N.D.C.C., and

again I cannot say that a reasoning mind could not have reasonably decided that the agency's factual conclusions were supported by the weight of the evidence. I, therefore, agree with the majority that the agency decision must be affirmed.